### E. F. MEAD v. STATE.

No. A-9412.   Oct. 7, 1938.
(83 P. 2d 404.)

Gaylor R. Wilcox, of Sapulpa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for the State.

DOYLE, J. The information in this case charged that E. F. Mead did in Okmulgee county, on or about the 25th day of March, 1936, commit the crime of murder. The charging words are: "did unlawfully, willfully and feloniously, without authority of law and with a premeditated design to effect death of one Addison Snell, strike, beat and knock the body of him, the said Addison Snell into a ditch or excavation then and thereby inflicting upon

the body of him, the said Addison Snell, one mortal wound of which he, the said Addison Snell, thereafter on the 5th day of April, 1936, did die; that the said E. F. Mead in the manner and form aforesaid, did kill and murder the said Addison Snell, contrary to," etc.

Upon the trial the jury returned their verdict finding the defendant guilty of manslaughter in the second degree, but were unable to agree upon the punishment. A motion for a new trial was made and denied, and the court sentenced the defendant to serve a term of two years' imprisonment in the state penitentiary. From the judgment rendered June 12, 1937, he appeals.

In this court it is contended that the evidence is insufficient to support the verdict and that the judgment is contrary to the law and to the evidence; that the court erred in its instructions on the law of manslaughter in the second degree, and erred in overruling the motion for a new trial.

It appears that the defendant, Mead, and the deceased, Snell, were both employed with a number of other men digging a ditch and laying tile for a sewer in the city of Okmulgee. It was a WPA project. The ditch was from the intersection of Kern and Second streets, north, between the east side curb and the center of Kern street. The ditch was four or five feet wide and seven or eight feet deep; the tile being two and three feet in diameter, was strung along the bank, three or four feet east of the ditch.

The day before the date alleged Jolly, the time-keeper, informed the defendant that he was discharged from that project. The next day, the defendant passing by stopped and talked with Jolly. McDonald, assistant foreman, was present. Jolly said, "Here is the card showing why you were discharged." The defendant said, "Read it." Jolly said he could not read it, that Mr. Foote wrote it, then

called Foote and asked him to read it. Foote took the card. It read: "Discharged because he was overbearing to the time-keeper." Foote said he was discharged because he bawled out the time-keeper. While they were talking Mr. Snell came up, pointed his left hand at the defendant's face and said something. The defendant turned and struck or pushed him with his left hand and he fell into the ditch. Eleven days later Mr. Snell died; an autopsy showed that a blood clot or embolism in the left pulmonary artery caused his death.

Dr. W. C. Vernon testified that Addison Snell was brought to the Okmulgee Clinic March 25th, and was there under treatment until he died, April 5, 1936. That, assisted by Dr. Raines, he made a post-mortem examination, that they found that he had an embolism or blood clot in the left pulmonary artery, which was the cause of his death.

On cross-examination he was asked:

"Q. That blood clot could have been caused by a dozen different things? A. Yes, sir. Q. Bad teeth could cause it? A. Well, anything could cause a blood clot."

Dr. H. L. Rains testified that he was present and assisted Dr. Vernon in making the post-mortem examination, which disclosed an embolism or blood clot in the left pulmonary artery, and they found a fractured spine; that in his opinion the blood clot caused death; that he did not know what caused the blood clot.

W. A. Jolly testified that he was time-keeper on the sewer project; that about 4 o'clock, afternoon of March 25th, he was sitting there on a tile with Billy McDonald. The defendant came up and said he was trying to run down information on his discharge ticket. He said, "Mead, I have got these tickets," and handed a ticket to him, a 403 is what they call it. That he could not read it and called Mr. Foote, the foreman, he came up and

read it, the defendant said, "Foote, I blame you for this for listening to a lots of damn lies." About that time Mr. Snell rushed up and said, "Yes, you did, yes, you did." Mead wheeled and struck Snell and he went in the ditch. Mead hit him with his left hand; that Foote was about two steps south of Mead and he turned and struck Foote several blows and got him down on the tile.

P. J. Foote testified that he was foreman on the project; that he gave Mead a 403, because the time-keeper complained about him being insulting to him; that when a man gets one of these 403 he is discharged; that he was about 20 feet away when the defendant and Mr. Jolly engaged in a conversation, called him up; Billy McDonald was present. The defendant asked him what this meant; he told him he had been causing trouble and Mr. Jolly was complaining about him being insulting to him. Mead wanted to know what he had done; about that time Mr. Snell rushed up and said, "Yes, you did, Yes, you did." Mead turned, took a side swipe at him with his left hand and he went in the ditch. He told Mead that he was going to call the police and Mead said, "Damn you, you are going to take it up," and Mead knocked him down over the tile.

Bob Borland testified that he was working on the project, and was probably 40 feet from the difficulty; that he looked up just as Mr. Snell came along and made a gesture with his left hand, and Mr. Mead hit him on the right side of the face with his left hand, then the bunch ran up, Mead turned and started on Foote, and they fell on some tile; that he took hold of Mr. Mead's left arm and told him to quit, that he could not have trouble on the job.

Billy McDonald testified that he was assistant foreman on the project and witnessed the difficulty between the defendant and Mr. Snell. That he was sitting on a pipe talking to Mr. Jolly when Mr. Mead came up and

said he had a 403 turned in on him. He handed the slip to Mr. Jolly and asked him to read it, Jolly said he could not read it and called Mr. Foote. While they were talking Mr. Snell came up and stuck out his left hand at Mead and said something, and Mead struck him on the right side of the face, left handed, and the blow knocked him in the ditch.

John Ward testified that he was safety foreman and saw Mr. Jolly, time-keeper, and Mr. McDonald, assistant foreman, sitting on a tile when Mr. Mead came by and talked to them, someone called Mr. Foote, the foreman, he came up, and while they were talking Mr. Snell came up there, and there were some words between Mead and Snell, and Mead hit him and he fell down in the ditch; that the party had been talking there about 10 minutes before Mr. Snell went down there.

On the part of the defendant, Otis Lewis testified that he was working on the south end of the ditch; Mr. Mead came up from the south, Mr. Jolly, time-keeper, was sitting on the tile on the east side of the ditch, facing west; Mr. Foote was standing west of and facing him; Mr. Mead was standing north of and talking to both of them; Mr. Snell was north of where they were near the tool rack, and he walked pretty fast down to where they were. He came up behind Mead, a little to his right side, and had his hammer in his hand and shook a finger of his left hand at Mead, and said, "Listen here, you." Mead turned around and slapped him, hit him open handed, after he went in the ditch, Mead started towards the ditch, Foote started that way and struck at him, and Mead tied into him.

Clyde Pinkston testified that he was working at the south end of the ditch. Mead came by and talked to him about five minutes, then went on north to where Mr. Jolly was sitting on some tile, and while they were talking Mr. Foote came up from the north, Mr. Snell was at

the north end of the ditch; that he saw Snell come up behind Mead, he shook his finger at him and said something. Mead turned and with his left hand slapped him.

Jim Ewing testified that he was working on the project and a short time before the difficulty saw Mr. Mead at the south end talking to some boys, then he came on up the ditch to where Mr. Jolly was sitting on a tile; that he was shoveling about 10 feet south of them; that after Jolly and Mead talked a few minutes Jolly called Mr. Foote, and he came down where they were. Jolly had a card and handed it to Mead, then Jolly gave the slip to Foote; they were talking about this card. Mr. Snell was north of them about 50 feet, he came stepping down, Mead was standing in front of Jolly and north of Foote when he came up, and they were talking; Mead was standing with his back towards Mr. Snell when he came up on his right hand side, and said, "You did, you did," and he came up with his hand, Mead struck him with his open hand, and he staggered and fell in the ditch, they were all between the tile and the ditch, then Mr. Foote and Mead went to fighting, and they were separated.

On cross-examination he stated Mead used his open left hand; Mr. Snell staggered around and fell in the ditch; that he did not think Mead knocked Mr. Snell in the ditch.

Dows Petree testified that he was working on the south end of the ditch when Mr. Mead came by and talked to some of the boys, then walked on north; that there was tile piled back about 4 feet from the ditch; that after Mr. Jolly and Mead started talking, witness went to get a drink, and in coming back walked between them and the ditch, stopped to roll a cigarette. Jolly told Mead he had a 403 for him; Mead asked him to read it, then Jolly called Mr. Foote. Mead asked him if that was his 403. He said, "Yes." Mead said, "Read it"; Foote put on his glasses and read it. Mead said he was at the office and

they didn't have any record of it there. Mr. Snell came down there and had a claw hammer in his right hand. Mead had his back to him, Mr. Snell came from the north and walked in front of him and pointed his finger in his face and said, "You are a dirty liar." Mead turned and slapped him and he went off in the ditch.

Edward Carl testified that he was working on the project, saw Mr. Mead stop and talk to somebody and went on to where Mr. Jolly was, then started on. Jolly called him back and had a paper in his hand, then Jolly called Mr. Foote, and he came down there, that he heard some one ask, "What is on that card?" Four or five minutes later Mr. Snell came down there, Mead was talking to Foote, Mr. Snell shook his finger in his face, but he could not understand what was said, and Mead struck him with his hand on the face, and Mr. Snell fell into the ditch, there was a little hole right back of Mr. Snell and it looked like he stepped into it and got overbalanced; at that time he went to look after Mr. Snell.

Sherman Sowers testified that he was working on the ditch and saw the difficulty. Mr. Jolly and Mr. Mead were standing there talking. Jolly called Mr. Foote and Mr. Snell came up, and he saw him shaking his finger in Mead's face, Mead pushed him back out of the way, and he stumbled and fell in the ditch; that he could not understand what was said, but heard Mr. Snell tell Mead he was a liar and kept shaking his finger in his face.

As a witness in his own behalf, the defendant, Mead, testified that he lived at Okmulgee with his family, wife and two daughters at home; was employed as a laborer on the project; went to the WPA office that morning to find out why he had been discharged, and the lady said his card was not in; that after dinner he went to Ball Brothers Glass Factory, trying to get some work, and came back by the project; talked to some of the boys working at the south end and started home, passed by Mr.

Jolly and Billy McDonald, spoke to them and went on, Jolly called him, and he walked back. Jolly said, "I have got a card showing why you were fired." That he asked him to read it, Jolly said Mr. Foote wrote it, and he called him. Foote came up from the north and Jolly asked him to read the card, Mr. Foote read, "overbearing to the time-keeper," and he said he was not overbearing with him. In a few minutes Mr. Snell càme up on his right side and shoved his hand up in his face and said, "You did, you are a liar," and shook his left hand in his face; that he struck his hand and shoved it out of his face, but could not say whether or not his hand hit Mr. Snell on the face; that he did not intend to hurt Mr. Snell. Then Foote said, "Get him boys," and struck at him, then they grabbed one another, he pushed Foote over on the tile and asked somebody to hold Foote until he could get away from him.

The defendant called a number of witnesses to show that his general reputation as a peaceable, quiet, law-abiding citizen was good. The testimony of these witnesses covered a period from 5 to 17 years, while a resident of Okmulgee county. The state put in no evidence to rebut that of the defendant as to previous good character.

The transcript of the testimony covers over 250 pages, but the foregoing is in substance the material testimony in the case.

The record shows that when the state rested, counsel for the defendant asked the court to direct a verdict for the defendant. Overruled. Exception. Again at the close of all the evidence, counsel for the defendant demurred to the same upon the ground that the facts proved did not support the allegations of the information, and asked the court to direct the jury to return a verdict of not guilty. Overruled. Exception.

Upon a careful examination of the case-made we do not think we would be warranted in sanctioning the verdict and judgment in this case.

Manslaughter in the first degree is defined by St. 1931, § 2223, 21 Okla. St. Ann. § 711, of the Penal Code, as follows:

"Homicide is manslaughter in the first degree in the following cases:

"1. When perpetrated without a design to effect death by a person while engaged in the commission of a misdemeanor.

"2. When perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide.

"3. When perpetrated unnecessarily either while resisting an attempt by the person killed to commit a crime, or after such attempt shall have failed."

Section 2228, 21 Okla. St. Ann. § 716, defines manslaughter in the second degree as follows:

"Every killing of one human being by the act, procurement or culpable negligence of another, which, under the provisions of this chapter, is not murder, nor manslaughter in the first degree, nor excusable nor justifiable homicide, is manslaughter in the second degree."

St. 1931, § 2235, 21 Okla. St. Ann. § 731, of the Penal Code provides that homicide is excusable:

"2. When committed by accident and misfortune in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat provided that no undue advantage is taken, nor any dangerous weapon used, and that the killing is not done in a cruel or unusual manner."

Another provision of the Penal Code, St. 1931, § 1867, 21 Okla. St. Ann. § 643, provides among others, that: "To use or attempt to offer to use force or violence upon or

toward the person of another is not unlawful," when committed by the party about to be injured, in preventing or attempting to prevent an offense against his person; provided the force or violence used is not more than sufficient to prevent such offense.

The charge of the court submitted the issues of murder, manslaughter in both degrees, justifiable homicide in self-defense, and excusable homicide.

The jury are bound to take the law from the court. It is for the court to determine what degree or degrees of homicide the evidence tends to establish, and it is the duty of the court to confine its charge to such degrees. The evidence on the part of the state eliminates the theory of murder, and was wholly insufficient to show that the included crime of manslaughter in the first degree was committed, and those issues should not have been submitted to the jury.

The jury has the right to find the defendant guilty of any offense the commission of which is necessarily included in that with which the defendant is charged (St. 1931, § 3097, 22 Okla. St. Ann. § 916), and the jury has the right to determine the degree of the crime committed in a homicide case, yet its determination must be based upon evidence.

The charge of the court should not extend beyond a plain statement of the law applicable to the case. Under the law and the evidence in this case the issues to be determined by the jury were manslaughter in the second degree, or whether the alleged homicide was excusable under the provisions of St. 1931, § 2235, 21 Okla. St. Ann. § 731, supra, and where the evidence justifies it, as in this case, the court should have instructed the jury on the issue of assault and battery.

It is contended that the court committed prejudicial error in giving the following instruction:

"Instruction No. 26. If you find the defendant guilty of manslaughter in the second degree, you may assess his punishment, which shall be by imprisonment in the state penitentiary for a period of not less than 2 years and not more than 4 years."

The giving of this instruction was not excepted to. It was assigned, however, as one of the grounds of the motion for a new trial.

Section 2234, St. 1931, 21 Okla. St. Ann. § 722, of the Penal Code, provides that:

"Every person guilty of manslaughter in the second degree is punishable by imprisonment in the penitentiary not more than 4 years and not less than 2 years, or by imprisonment in a county jail not exceeding 1 year, or by a fine not exceeding $1,000 or by both fine and imprisonment."

It is a well settled general rule that where the record shows no objection made or exception taken to the instructions given by the trial court, this court looks no further than to see if fundamental error has occurred.

In the case of Colbert v. State, 4 Okla. Cr. 487, 113 P. 561, it is said:

"Where an instruction given only states the maximum term of imprisonment and omits to state the minimum or alternative punishment that may be imposed, held, that the judgment and conviction must be reversed."

In Wells v. State, 5 Okla. Cr. 22, 113 P. 210, it is said:

"Many errors committed by a trial court may be cured by the consent of the defendant, evidenced by the fact that no objection was made or exception thereto saved at the proper time. But we do not believe that even with the consent of the defendant a verdict should stand where the court has substituted a great and a different punishment in the instruction than that provided by law."

Upon an examination of the instructions we are satisfied that, taken together, the instructions do not correctly

state the law of the case, and the giving of instruction No. 26, above quoted, was prejudicial to the substantial rights of the defendant, and constitutes fundamental error.

It is contended that the evidence is not sufficient to support the verdict and the judgment rendered thereon.

It will be observed that the evidence, both on behalf of the state and that of the defendant, shows that the defendant was at a place where he had a right to be; that the deceased was the aggressor, used abusive language, and made an assault upon the defendant, and the testimony of all the witnesses shows, or tends to show, that the alleged homicide was committed by accident and misfortune, in the heat of passion, upon sudden provocation, and that no undue advantage was taken, nor any dangerous weapon used, and without any unlawful intent. The testimony on the part of the defendant was that the blow struck by the defendant was for the purpose of preventing the deceased continuing in his assault upon the defendant.

In construing this section, this court has said: The word "misfortune," as used in section 2235, defining excusable homicide, is analogous to the word "misadventure," which, when applied to homicide, means the act of a man who in doing any lawful act and without any unlawful intent unfortunately kills another person. Gaunce v. State, 22 Okla. Cr. 361, 211 P. 517.

That every man has the right to defend himself against any assault is elementary. No man is bound to measure the extent of an injury about to be done before he would be justified in defending himself.

Accidental death, to be wholly excusable, must have resulted from the doing of some lawful act. Johnson v. State, 59 Okla. Cr. 288, 58 P. 2d 156; Tucker v. State, 41 Okla. Cr. 169, 272 P. 483.

Ruling Case Law, vol. 13, p. 863, sec. 166, reads in part as follows:

"When the death of a human being is the result of accident or misadventure, in the true meaning of the term, no criminal responsibility attaches to the act of the slayer. When it appears that a killing was unintentional, that the perpetrator acted with no wrongful purpose in doing the homicidal act, that it was done while he was engaged in a lawful enterprise, and that it was not the result of negligence—the homicide will be excused on the score of accident."

When we recall the presumption that the law always indulges as to the innocence of the defendant, and the necessity of establishing his guilt beyond a reasonable doubt, we think it would have been a proper exercise of the power vested in the trial court to have advised the acquittal of the defendant on the ground that the evidence was insufficient to warrant a conviction.

For the reasons stated, the judgment of conviction is reversed, and the cause remanded to the district court of Okmulgee county for further proceedings not inconsistent with the views herein expressed.

DAVENPORT, P. J., and BAREFOOT, J., concur.