STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
BENJAMIN A. CHRISTENER, JR., DEFENDANT-APPELLANT.

Argued September 9, 1975—Decided July 14, 1976.

Mr. *James A. Geller* argued the cause for appellant.

Mr. *Solomon Rosengarten,* Deputy Attorney General, argued the cause for respondent (Mr. *William F. Hyland,* Attorney General of New Jersey, attorney; Mr. *Rosengarten,* of counsel and on the brief).

The opinion of the Court was delivered by

PASHMAN, J. Defendant-appellant Benjamin A. Christener, Jr. was convicted of manslaughter for the shooting death of one John French during an altercation at defendant's trailer home in Franklin on October 1, 1972. Defendant was sentenced to the State Prison for a term of four to six years.

The Appellate Division affirmed in an unreported opinion and this Court granted certification, 67 *N. J.* 81 (1975). Although appellant seeks relief on multifarious grounds, we find material only the question of the propriety of an instruction on first degree murder under the facts of this case. Having reviewed this issue, we conclude that there was error requiring a reversal.

I

The October 1 shooting incident was actually the culmination of a larger skein of events which occurred during the preceding one-year period. Benjamin Christener was the proprietor of a tavern in Newton. Although married, he was separated from his wife and divorce proceedings had been instituted. Because he lived alone and devoted long hours to his business, defendant resided in a small house adjoining the tavern.

During this period, Mrs. Britt French, wife of the decedent, frequently visited defendant's tavern with friends from

work. Through these visits, defendant became aware that Mrs. French was experiencing serious marital problems with her husband. For instance, defendant noticed that Mrs. French often received telephone calls from her husband which left her "white, pale, nervous and upset." He also learned that Mrs. French had been threatened by her husband and, as a result, feared for her own safety and that of her four-year-old daughter. On one occasion, Mrs. French came to the tavern with a black eye from a beating which she had received from her husband. While at the tavern, Mrs. French related to defendant other instances of her husband's brutality. For example, on one occasion, after attempting to discuss their marital problems, Mrs. French had been beaten and choked. Mrs. French testified to other beatings she had received as well as an attempt on her life during which she narrowly escaped being thrown from a cliff.

Perhaps most emblematic of this troubled marriage was an incident which occurred on February 26, 1972 involving Mr. and Mrs. French and the defendant. Upon leaving her place of employment at the end of the working day, Mrs. French was unable to locate her car. After accepting a ride from a friend, she went to defendant's tavern where she found both the car and her husband. Earlier, John French had come to the tavern, introduced himself to defendant as the theretofore unknown telephone caller, and indicated to defendant his suspicions concerning his wife's infidelity. Mrs. French at this point entered the tavern and asked her husband if he had taken her car. When he said that he had, she left the building and proceeded toward the parking lot. Before she reached the car, her husband, who had followed her, pushed her to the ground and began to beat her. Defendant observed the assault and then called the police who had to physically restrain and escort Mr. French from the lot. In addition to threatening his wife, French directed a variety of threats and epithets at defendant who had joined the bystanders watching French's arrest. Mrs. French later

filed a complaint against her husband who was incarcerated for five days after his conviction in Municipal Court.

Because her entreaties to the local police were generally unsuccessful, defendant, sometime in February, contacted the State Police on her behalf and later arranged for Mrs. French and her daughter to stay at a nearby motel. A bond of affection subsequently developed between defendant and Mrs. French. Mrs. French had by that time instituted divorce proceedings against her husband and had agreed with defendant to be married when their respective divorces were final. In anticipation of this marriage, defendant purchased a mobile home in the Borough of Franklin and Mrs. French and her daughter established residence there.

During the ensuing months, Mr. French made frequent telephone calls both to defendant's tavern and to the mobile home, during which he threatened defendant, Mrs. French and her daughter. On one occasion in July 1972, French directly confronted Mrs. French and her daughter at the local unemployment office. Hoping to avoid an altercation, Mrs. French and her daughter waited in the ladies' lounge until it was time for her interview. During the interview, however, Mrs. French heard the daughter's scream when John French attempted to drag her from the building. Pulling the girl away from her father, Mrs. French summoned the police to escort her to her car.

As a result of these incidents, defendant learned to fear John French largely because of his threats which were made credible by French's great strength and his apparent ability to carry out the threats. While defendant and French were of comparable size, the decedent was a much stronger man. Defendant's fear of French was also heightened by his unavailing efforts to secure police protection for himself and Mrs. French. Although he had purchased a shotgun for protection at Mrs. French's insistence after the employment office incident, defendant continued to actively seek police protection. Nonetheless, the local police proved relatively unsympathetic to his complaints. His inability to impress the police with

the seriousness of John French's threats and his own fear of the man produced a sense of frustration and helplessness in defendant. This frustration was manifested after an unsuccessful plea for protection to the local police chief on September 15 when defendant remarked, "I have a gun down at the tavern and I will shoot the son of a bitch." This statement, though petulant, stands in stark contrast to defendant's general behavior pattern during this time period. Generally, defendant made great efforts to avoid potential confrontations with French, and his normal activities were altered to accommodate his fear. For example, defendant often slept in the tavern for personal safety. He also had his telephone number changed. On one occasion, he called the police and had French and several companions escorted from the bar after French earlier had threatened to "bring hoods from New York [to] break the place up and get the pair of you."

On Friday, September 29, 1972, Mrs. French informed defendant that she expected her husband to visit the mobile home the next day in conjunction with visitation rights which had been granted at the divorce hearing. Afraid that John French might kill her, Mrs. French asked defendant to be present and to bring the shotgun with him from the tavern. Defendant consented.

The next morning defendant arrived at the mobile home and placed the shotgun in one of the back rooms. By early afternoon, when French still had not come, defendant, accompanied by Mrs. French and her daughter, decided to do some errands, have supper and then do some work at the tavern. At approximately 11 P.M. they returned home. After Mrs. French and her daughter had gone to sleep, defendant locked both the outside storm door and the inside wooden door and secured the chain lock. He then watched television for awhile and fell asleep in the living room.

He was rudely awakened in the early morning by the constant ringing of the doorbell. Unable to ascertain from a nearby window who was ringing the bell, he asked the visitor to identify himself  In response, John French demanded ad-

mittance to the trailer and threatened to kill Christener. When defendant refused to open the doors, French began pounding on the storm door and swearing at both defendant and Mrs. French. Although defendant urged French to leave, these pleas only further enraged him. Defendant aroused Mrs. French in the hope that she might be better able to mollify her estranged husband. However, her efforts also proved unsuccessful, and French continued to bang on the door. When French began to pry the storm door open, defendant telephoned the police, reported a breaking and entering and asked that assistance be sent immediately. At this point, French succeeded in pulling the storm door out of its frame and began pounding on the inside wooden door. Defendant told French that the police had been summoned and would arrive momentarily. This, however, did not deter his efforts to get inside the trailer. Suddenly, the door gave way and was held by only the chain lock. Mrs. French screamed for defendant to "do something" and he ran to the rear of the mobile home for the shotgun. Retrieving the weapon, he proceeded to load it as he ran towards the living room. Just as he returned, the chain on the front wooden door broke and John French entered the room. Because of the confined quarters, defendant was unable to raise the shotgun to his shoulder and, instead, held it by his side. Although French did not appear to be armed, according to defendant he looked like a "wild man." French moved towards Mrs. French and attempted to grab her though she successfully eluded his grasp. Defendant ordered the intruder to leave and repeated that he had called the police. French lunged towards Mrs. French and defendant fired the shotgun. Although he had only intended to hit French in the arm, the unusual manner in which he was forced to fire the weapon (while holding it at his side) and his inexperience in shooting from such a position drastically reduced defendant's ability to aim the shotgun. Because of this and also because of the scattering effect of the single shotgun shell,

multiple wounds were inflicted on French and knocked the decedent to the floor.

Immediately after the shooting, Mrs. French telephoned the police to report the incident and to request that an ambulance be sent. A medical examiner later ascertained that multiple pellet wounds sustained from the shotgun blast had produced the massive hemorrhaging which was the ultimate cause of French's death. The examiner also found that the alcohol content of the body far exceeded that level at which an individual is considered to be under the influence of alcohol.

Defendant was indicted in Sussex County and charged with murder in violation of *N. J. S. A.* 2A:113–1 and *N. J. S. A.* 2A:113–2. After a 14-day trial, the court instructed the jury as to the substantive offenses of first and second degree murder and manslaughter, the duty to retreat and the affirmative defenses of self-defense and the defense of others. The jury found defendant guilty of manslaughter and the Appellate Division thereafter affirmed. We granted certification to consider the substantive questions posed by this case. 67 *N. J.* 81 (1975).

II

First, we consider the propriety of the trial court's instructions to the jury as to first degree murder, *N. J. S. A.* 2A:113–1 and *N. J. S. A.* 2A:113–2. We limit our discussion to considering whether this instruction was supported by the evidence. We are cognizant of the fact that neither party has raised an objection to this instruction. Nonetheless, because of the potentially prejudicial effect of an erroneous instruction, we raise the question *sua sponte* pursuant to our power to "notice plain error not brought to the attention of the trial or appellate court." *R.* 2:10–2. *See State v. Macon,* 57 *N. J.* 325 (1971); *State v. Hock,* 54 *N. J.* 526, 538 (1969), *cert.* den. 399 *U. S.* 930, 90 *S. Ct.* 2254, 26 *L. Ed.* 2d 797 (1970).

We consider the issue in two parts. The first part concerns the sufficiency of the evidence to support the instruction of first degree murder. Because we find the evidence in this regard to be inadequate, the second part of our discussion considers the prejudice which defendant suffered as a result of this charge.

## A.

The crime of murder in New Jersey is one which is delineated by *N. J. S. A.* 2A:113-1 and *N. J. S. A.* 2A: 113-2. As embodied in those provisions, the crime consists of the unlawful, unjustified and inexcusable killing of one person by another with malice aforethought. 1 *Warren, Homicide,* § 54 at 162 (1938) ; 1 *Wharton, Criminal Law and Procedure,* § 187 at 432 (1957). In order to warrant an instruction as to *first* degree murder and sustain a conviction thereon, the State must also show that the killing was "willful, deliberate and premeditated."[1] *State v. Gardner,* 51 *N. J.* 444, 459 (1968) ; *State v. Billingsley,* 46 *N. J.* 219 (1966) ; *State v. Di Paolo,* 34 *N. J.* 279, 295 (1961) ; *cert.* den. 368 *U. S.* 880, 82 *S. Ct.* 130, 7 *L. Ed.* 2d 80 (1961). The elements of willfulness, premeditation and deliberation are not only essential to establishing the crime, but also serve to distinguish this offense from the related offenses of second degree murder and manslaughter. Malice also distinguishes murder from manslaughter, and the prosecution is assigned the burden of proving malice and disprov-

---

[1] Upon this general definition of the crime the State has engrafted other types of killings in ostensible response to matters of policy. As a result, first degree murder may be charged for killings committed in the perpetration of certain common law felonies (arson, burglary, kidnapping, etc.), *State v. Smith,* 32 *N. J.* 501 (1960), *cert.* den. 364 *U. S.* 936, 81 *S. Ct.* 383, 5 *L. Ed.* 2d 367 (1961) ; *State v. Sinclair,* 49 *N. J.* 525 (1967) ; *State v. Di Paolo, infra,* 34 *N. J.* at 295, or by certain specified means (poison, lying in wait, etc.), *State v. Crivelli,* 89 *N. J. L.* 259 (E. & A. 1916), without independent proof of wilfulness, premeditation and deliberation.

ing facts which would reduce the offense to manslaughter. *State v. Gardner, supra,* 51 *N. J.* at 459; *State v. Robinson,* 139 *N. J. Super.* 475, 484 (App. Div. 1976). Proof of these statutory elements — the burden of which is placed on the State — must be sufficient to negate every reasonable doubt as to their nonexistence. *State v. Mills,* 51 *N. J.* 277 (1968). *See also Mullaney v. Wilbur,* 421 *U. S.* 684, 95 *S. Ct.* 1881, 44 *L. Ed.* 2d 508 (1975); *State v. Robinson, supra. See also,* Jones, "Presumptions Past, Present and Future," 4 *Crim. Justice Q.* 14 (1976).

In instructing the jury in the instant case, the trial court defined these elements using language which closely parallels that used by this Court in *State v. Di Paolo, supra.* In that case, Chief Justice Weintraub stated:

> As settled by judicial construction, the first element is premeditation, which consists of the conception of the design or plan to kill. Next comes deliberation. The statutory word "deliberate" does not here mean "willful" or "intentional" as the word is frequently used in daily parlance. Rather it imports "deliberation" and requires a reconsideration of the design to kill, a weighing of the pros and cons with respect to it. Finally, the word "willful" signifies an intentional execution of the plan to kill which had been conceived and deliberated upon. [34 *N. J.* at 295]

*Accord, State v. Ernst,* 32 *N. J.* 567, 579 (1960), *cert.* den. 364 *U. S.* 943, 81 *S. Ct.* 464, 5 *L. Ed.* 2d 374 (1961); *State v. Conyers,* 58 *N. J.* 123, 128 (1971). To support such an instruction, much less a conviction, it is necessary that evidence at trial establish the presence and concurrence of these elements. *State v. Van Duyne,* 43 *N. J.* 369, 378–79 (1964), *cert.* den. 380 *U. S.* 987, 85 *S. Ct.* 1359, 14 *L. Ed.* 2d 279 (1965); *State v. Washington,* 60 *N. J.* 170, 172 (1972). Failure to make this basic factual showing will effectively defeat a prosecutorial allegation of first degree murder. *State v. Smith, supra,* 32 *N. J.* 501; *State v. Roscus,* 16 *N. J.* 415 (1954); *State v. Schilling,* 95 *N. J. L.* 145 (E. & A. 1920). In determining whether the requisite factual showing has been made, the trial court must view

the "State's evidence in its entirety, giving the State the benefit of all of its favorable testimony as well as all the favorable inferences which reasonably could be drawn therefrom." *State v. Fiorello,* 36 *N. J.* 80, 90 (1961); *State v. Reyes,* 50 *N. J.* 454, 458–459 (1967); *State v. Loray,* 41 *N. J.* 131, 138 (1963). Having done so, the court should not allow the issue to go to the jury *unless* the jury could reasonably find the defendant guilty of that offense beyond a reasonable doubt.

Turning to the facts of this case, it becomes clear that the requisite showing was not made. Consequently, the first degree murder instruction should not have been given to the jury. The proofs fail to indicate that defendant ever designed or desired the death of John French. Although defendant harbored a distinct dislike for French — which he readily conceded at trial — defendant's principal reaction to the deceased was one of fear. Even if the record supported inferences of defendant's resentment for John French relating to French's visitation rights or to his intrusion into Christener's relationship with Mrs. French (which it does not), defendant's actions reveal an all-encompassing fear of his antagonist and therefore are far from probative of any intent or motive to kill French. Even while he was in the very act of shooting, defendant only intended to wound French, not to kill him. These facts mitigate against a finding of willfulness, that is, the intentional execution of a plan to kill the decedent, and against any suggestion that defendant had formulated such a plan in the first place. Even if we consider the fact emphasized by the State, that Benjamin Christener expected a visit from the deceased sometime during that day and had brought his gun to his home, this fact alone fails to establish the plan or design which is essential to proving the statutory element of premeditation. The shotgun was not loaded when French arrived at defendant's trailer. Defendant did not even bring the weapon into the living room until the deceased was just about to enter defendant's home. That a visit was expected affords

no insight as to whether defendant "deliberated" prior to the shooting. In fact, evidence that French's fatal visit occurred at one o'clock in the morning — long after the scheduled visit had been anticipated — clearly negates the inference that defendant was somehow lying in wait for decedent. This is further supported by defendant's uncontradicted and not unreasonable testimony that he was sleeping when French began banging on the mobile home doors. Because of the unseemly hour of the French visit, and the unbounded fear which French instilled in defendant, it is understandable that defendant would be wary of such a visit. This, however, falls far short of the deliberation element which must be proven in a first degree murder case. As was stated in *State v. Di Paolo, supra,* the term deliberation presupposes something more than "intentional" and instead suggests an assessment of the pros and cons of the preconceived plan to kill. Absent any proof that defendant had formulated such a plan, the attendant proof of deliberation is lacking.

We conclude that none of the specific criteria for first degree murder was established by the proofs in this case and that, consequently, an instruction as to this crime was unsupported by the evidence and should not have been given. It becomes necessary, therefore, to determine whether the trial court committed plain error in delivering this instruction.

*B.*

As a basic proposition of criminal law, a trial court may not instruct a jury as to the elements of a crime for which there is insufficient evidence to support a conviction. As one commentator states:

It is not proper for the court to give instructions, which, though they embody a correct statement of the law of evidence, are merely legal abstractions, where they are not connected with any evidence in the case. [2 *Underhill, Criminal Evidence* (5 ed. 1956), § 550 at 1373]

*See* 4 *Warren, supra,* § 330 at 120, § 344 at 333–35; *State v. Ernst, supra,* 32 *N. J.* at 573. Our consideration of whether the court committed plain error by delivering a charge as to first degree murder, must be conducted in light of the fact that the jury did not return a verdict of first degree murder, but instead only found defendant guilty of manslaughter. Because the inclusion of a first degree murder charge was not reflected in the verdict which was ultimately reached by the jury, it is arguable that this instruction was not prejudicial to defendant. This is especially true since the jury only found defendant guilty of manslaughter.

Two New Jersey cases, which bear a surface resemblance to the instant case, appear to support a conclusion that defendant did not suffer any prejudice. In *State v. Moynihan,* 93 *N. J. L.* 253 (E. & A. 1918), the defendant, who was convicted of second degree murder, contended that the trial judge did not properly distinguish first and second degree murder in his instructions to the jury. In affirming the conviction, however, the former Court of Errors and Appeals not only found the erroneous instruction to be favorable to defendant, but further stated:

As it appears that the defendant was convicted of murder in the second degree, it becomes unimportant under the evidence whether or not the court properly defined murder in the first degree. The erroneous definition could not possibly have prejudiced him, since the jury practically acquitted him of murder in the first degree by finding him guilty of murder in the second degree. [93 *N. J. L.* at 256–57]

The defendant in *State v. Adams,* 50 *N. J.* 1 (1967) was similarly convicted of second degree murder. On appeal to this Court, defendant contended that the trial judge erred in rejecting his motion for acquittal as to first degree murder. The Court upheld defendant's conviction and observed that "in the light of the testimony and the second degree verdict, no harm could be said to have resulted to the defendant from the denial of the motion." 50 *N. J.* at 4–5.

While both *Moynihan* and *Adams* are tangentially related to the present case, they are both readily distinguishable and, hence, are not dispositive of the issue here. In contrast to the insufficient proofs in this case, the courts in the earlier decisions implicitly found factual support for a first degree murder instruction as well as for the second degree charge of which the defendants were convicted. As this Court expressly stated in *Adams*:

Viewing the evidence and inferences favorable to the prosecution . . ., there was enough from which a jury could find beyond a reasonable doubt that the killing was "willful, deliberate and premeditated" within *N. J. S. A.* 2A:113–2. [50 N. J. at 4].2

█ We are unwilling and unable to reach a similar conclusion in this case. By our adherence to the general principle that jury instructions may only be delivered where they are supported by evidence in the record, we find that the first degree murder charge in this case was plain and harmful error requiring a reversal. In making this decision, we do not indulge the same latitude which permitted the *Moynihan* and *Adams* courts to find any resultant error to be harmless by virtue of the fact that lesser convictions were handed down. On the record in this case, there was a real possibility that the jury could have found the defendant not guilty. Hence, the possibility that the jury, in the absence of sufficient evidence to sustain a first degree murder charge,

---

2In *Moynihan*, the court commented upon the evidence which was presented in the record:

All the evidence in the case points to the fact that Fantry while sitting at a table, in social intercourse with his companions, without any warning and without any provocation on his part to the commission of the deed, was shot to death by some person. We cannot say that the characterization of the act, by the court below, as a deed committed in cold blood, and that the expression, that the person who fired the shot was apparently trying to commit murder or doing an act which might cause blood to shed, were not proper comments under the evidence in the cause. [93 *N. J. L.* at 256].

may have reached a compromise verdict suggests that Christener may have suffered prejudice by that instruction in spite of his manslaughter conviction. To the extent that the two earlier decisions support a contrary result in this regard, they are overruled.

The issue of prejudice which we find inherent in this precise situation has never been presented directly to a New Jersey court, though the issue has been considered by courts in other jurisdictions. These courts almost uniformly hold that an unsupported charge on first degree murder constitutes prejudicial and reversible error even where a verdict is returned by the jury on a different and lesser charge. *Leonard v. People,* 149 *Colo.* 360, 369 *P.* 2d 54 (Sup. Ct. 1962) (conviction of voluntary manslaughter reversed where there was insufficient evidence to support instructions on first or second degree murder) ; *Gipe v. State,* 165 *Ind.* 433, 75 *N. E.* 881 (Sup. Ct. 1905) (conviction of involuntary manslaughter reversed where there was insufficient evidence to sustain first degree murder instruction) ; *People v. Marshall,* 366 *Mich.* 498, 115 *N. W.* 2d 309 (Sup. Ct. 1962) (conviction of manslaughter reversed where insufficient evidence existed to sustain a charge as to first or second degree murder instruction) ; *People v. Hansen,* 368 *Mich.* 344, 118 *N. W.* 2d 422 (Sup. Ct. 1962) (conviction of second degree murder vacated where insufficient evidence existed to support instruction of first and second degree murder) ; *People v. Vail,* 393 *Mich.* 460, 227 *N. W.* 2d 535 (Sup. Ct. 1975) (conviction of voluntary manslaughter reversed where there was insufficient evidence to sustain first degree murder instruction) ; *State v. Enyard,* 108 *S.* W. 2d 337 (Mo. Sup. Ct. 1937) (conviction of manslaughter reversed where evidence did not justify a charge of first degree murder) ; *Whitehead v. State,* 115 *Neb.* 143, 212 *N. W.* 35 (Sup. Ct. 1927) (conviction of manslaughter vacated where evidence did not support an instruction on second degree murder) ; *Mead v. State,* 65 *Okla. Cr.* 86, 83 *P.* 2d 404 (Crim. Ct. App. 1938)

(conviction of manslaughter reversed where evidence did not support first degree murder .instruction).

The primary concern underlying these and comparable decisions is the potentially prejudicial influence that an unsupported instruction will wield in jury deliberations. For instance, such instructions will often result in an unwarranted compromise verdict even if they do not produce a conviction on the more serious charge. The court in *Runyan v. State,* 116 *Neb.* 191, 216 *N. W.* 656 (Sup. Ct. 1927) defined the problem as follows:

> While the charging of the defendant with a higher degree of homicide than he was guilty of, the submitting of that charge to the jury along with a form of guilty verdict, and the argument of counsel devoted almost exclusively to an advocacy of finding the defendant guilty of murder in the second degree are none of them absolute error, yet their cumulative effect was to wear down the individual wills of the jurors, and perchance to cause them to compromise and agree on a verdict for a lesser degree of homicide, rather than to consider only whether the accused was guilty of manslaughter or was innocent. We think it was prejudicial to the rights of the defendant. [216 *N. W.* at 658]

Similarly, in *Tate v. People,* 125 *Colo.* 527, 247 *P.* 2d 665 (Sup. Ct. 1952), the Supreme Court of Colorado found an unsupported instruction on first degree murder to be highly prejudicial to the defendant:

> The fact that the trial court gave an instruction on first degree murder when the essential elements are missing in the proof, it must be said that the jury could easily infer by the giving of such an instruction that these elements were present in the case. It presents a fertile field for discussion among jurors not skilled in legal technique, for finding a welcome opportunity to compose differences and agree upon a compromise verdict. We must say that it was prejudicial error under the circumstances of this case to give the instruction on first degree murder in the absence of proof of the necessary elements. [247 *P.* 2d at 672]

*Cf. People v. Stahl,* 234 *Mich.* 569, 208 *N. W.* 685 (Sup. Ct. 1926); *People v. Gill,* 43 *Mich. App.* 598, 204 *N. W.* 2d 699 (Ct. App. 1972).

While courts in this jurisdiction have not had the opportunity to examine this particular question, the policy which underlies the applicable rule has been reflected in cases considering related matters. For example, New Jersey courts have been reluctant to sustain instructions in homicide cases which were either confusing or which would have the effect of coercing a jury to reach a particular verdict. *State v. Wynn*, 21 *N. J.* 264, 270 (1956); *State v. Swan*, 130 *N. J. L.* 372 (E. & A. 1943). This concern has been particularly acute where the alleged confusion would result from the inability to distinguish between the various degrees of homicide. *State v. Bess*, 53 *N. J.* 10 (1968); *State v. Alexander*, 7 *N. J.* 585 (1951), *cert.* den. 343 *U. S.* 908, 72 *S. Ct.* 638, 96 *L. Ed.* 1326 (1952). It also finds expression in our reconsideration of the propriety of instructing a jury either to return a verdict of first degree murder or to acquit the defendant, without concurrently providing instructions as to intermediate charges. Although courts previously permitted such charges, *Roesel v. State*, 62 *N. J. L.* 216 (E. & A. 1898); *State v. Pulley*, 82 *N. J. L.* 579, 582 (E. & A. 1912); *State v. Moynihan, supra; State v. Merra*, 103 *N. J. L.* 361, 367 (E. & A. 1917); 5 *Wharton, supra*, § 2099 at 269–70; Annotation, "Absence of Evidence Supporting Charge on Lesser Degree of Homicide as Affecting Duty of Court to Instruct as to, or Right of Jury to Convict of, Lesser Degree," 102 *A. L. R.* 1019 (1936), in recent years this practice has been seriously questioned. To a large extent, our reconsideration of the "all-or-nothing" instruction has been grounded on the coercive effect which it potentially exerts on jury deliberations. In *State v. Sinclair, supra*, this Court stated:

> To force the jury to choose on the evidence in the case between first degree murder and acquittal raises the possibility that the defendants might have been convicted of first degree murder though their guilt was of a lesser degree. [49 *N. J.* at 543]

*Accord, State v. Mathis*, 47 *N. J.* 455, 467 (1966), aff'd 52

*N. J.* 238 (1968), rev'd on other grounds, 403 *U. S.* 946, 91 *S. Ct.* 2277, 29 *L. Ed.* 2d 855 (1971), rehearing den. 404 *U. S.* 876, 92 *S. Ct.* 31, 30 *L. Ed.* 2d 125 (1971). The concern which is expressed in these cases for the integrity of jury verdicts parallels the concern in other jurisdictions about unwarranted compromise verdicts.

▆▆ ▆▆ Besides contravening the principle against compromise verdicts, the trial court's instruction on first degree murder also undermined a judicial policy concerning the presumption which is entertained when a murder is found to be unlawful. In such cases, the law presumes the crime to be second degree murder. *State v. Bess, supra; State v. Gardner, supra,* 51 *N. J.* at 456–59; *State v. Williams,* 29 *N. J.* 27, 43 (1959). This presumption is intended to favor the defendant by emphasizing the burden of proof which is placed on the prosecution before a conviction for first degree murder can be sustained. By instructing the jury on first degree murder, the trial court in the instant case effectively circumvented this presumption and subjected defendant to liability for which there was no factual support. This instruction should be examined in light of the State's obligation to prove, beyond a reasonable doubt, the absence of facts which would reduce a murder charge to manslaughter. *See Mullaney v. Wilbur, supra; State v. Gardner, supra,* 51 *N. J.* at 459; *State v. Robinson, supra,* 139 *N. J. Super.* at 484–85.

▆▆ These policy considerations impel us to provide needed guidance on this substantive and crucial question. Henceforth, it should be regarded as error for a trial judge to deliver a jury instruction on a criminal charge for which there is no, or insufficient evidence to support the instruction. It must be assumed that the jury inferred by the giving of such an instruction that the elements of that charge were present in the case. Jurors are not skilled in legal techniques. They welcome an opportunity to compose differences and agree upon a compromise verdict. *See State v. Thomas,* 140 *N. J. Super.* 429 (App. Div. 1976).

We cannot say under the circumstances of this case that sufficient evidence of first degree murder exists. This point is even implicitly conceded by my Brethren in dissent. Despite their finding a first degree murder charge to be justified by suppositions of how a jury might have viewed the evidence, the dissenters would, nonetheless, reduce defendant's sentence from 4-6 years to 1-2 years. This disposition is clearly anomalous for a crime which the dissent would otherwise portray as a cold-blooded murder. The penalty which the dissenters recommend is more befitting of a lesser crime, and suggests their ambivalence concerning the result which they would reach and the hypothetical proofs upon which it is predicated. Convictions for murder must be grounded on something more than possibilities or suspicions.

## III

We have considered the other grounds for appeal and find them without merit.

For the reasons set forth above, the decision of the Appellate Division is reversed. We order a new trial consistent with the principles we have enunciated.

HUGHES, C. J. (concurring). I concur in the opinion of Justice Pashman for the majority. However, in addition to the points made in the majority's opinion, I would especially comment upon the fact that the tragic event occurred in the very home of the defendant. The significance of that factor, I feel, should be emphasized by a specific approval by us of the relevant charge of the court, which was as follows:

No duty to retreat is imposed upon a person who, free from fault in bringing on a difficulty, is attacked at or in his dwelling house.

I charge you that a man is not bound to retreat from his house. He may stand his ground there and kill any person who enters by force for the purpose of committing great bodily harm upon one inside the home.

In such case, I charge, the owner of the home or any occupant of said home may meet the intruder and prevent him from causing great bodily harm by any means rendered necessary, even to the taking of the life of the intruder.

In this regard I charge you that [the deceased] had no right to be in the premises, and that his presence was in the violation of the criminal laws of this State.

Before applying this principle you will examine all the evidence in the case to determine from the evidence whether the defendant used reasonable force to repel the attack, that is, such force as he believed necessary to protect himself and members of his family or household therein in the circumstances as they reasonably appeared to him. If you so find, the killing is justifiable and the defendant shall be acquitted.

It is a regrettable fact that in modern day America personal security has diminished because of the threat of physical violence. Whether on subway, in bus terminal, on public street or in public park, in sheltered suburb as well as in urban ghetto, one feels the lurking threat of violence. Citizens are being attacked and robbed in broad daylight in the very shadow of State House, court house and other public buildings. There is a constant search for causes of this phenomenon. Some point to drugs and desperate crimes committed to satisfy addiction. Others blame juvenile violence whether from poverty, family breakdown, permissiveness or other factors. Still others stress the violence of the hard core predatory criminal who feasts on pain and hurt to his victims. Some indeed see as a cause the occasional excessive lenience of judges, or the inadequacy of law enforcement.

In the present context the cause is less important than the effect, — the obvious fact of modern life which is seen in the rise of violence in our society.

But it has generally been supposed that once the sanctuary of home was reached, and the front door locked, and that other satisfying part of human life resumed, — that one could leave behind the travails of daily work or travel and the dangers of the street; — that there would

be a respite, — a security, — something of an oasis of shelter from danger.

The sanctity of home is not new. At the common law it was thought impervious even to royal or official intrusion. Mr. William Pitt the Elder in addressing Parliament once said:

The poorest man may in his cottage bid defiance to all the forces of the crown. It may be frail — its roof may shake — the wind may blow through it — the storm may enter — the rain may enter — but the King of England cannot enter! — all his force dares not cross the threshold of the ruined tenement! [1 *H. Brougham, Historical Sketches of Statesmen Who Flourished in the Time of George III*, at 39–40 (1854)].

And our ancestors secured this concept of immunity from intrusion in the Fourth Amendment:

The right of the people to be secure in their * * * houses * * * against unreasonable searches and seizures, shall not be violated * * *.

This protection "did but embody a principle of English liberty, a principle old, yet newly won, that finds another expression in the maxim 'every man's home is his castle.'" Fraenkel, "Concerning Searches and Seizures," 34 *Harv. L. Rev.* 361, 365 (1921) (footnotes omitted). *See also Semayne's Case,* 77 *Eng. Rep.* 194, 195 (K. B. 1604); 4 *W. Blackstone, Commentaries* *223.

The situs of the tragedy involved here was a home, albeit a mobile home. And in any fair view of the evidence it was the defendant's home. The legal, moral or other status of another occupant of the home was totally immaterial to the present issue, — something to be judged in another tribunal perhaps, or under different moral concepts. The fact of the matter was that a brutal, drunken, powerful and obviously dangerous intruder threatened imminent deadly harm to one within the confines and, I think, legally within the protection of that home. The defendant here sought to exercise

that protection, — and his right and justification to do so was properly stressed by the trial court.

I think the defendant's conduct would have been judged by a different standard in the "ordinary" case, — if it had occurred, let us say, in a public street with a policeman on a nearby corner, or in a well-lighted parking lot with possible citizen help nearby. But in an isolated home, with unavailing calls for help to reluctant police, after a forcible and violent entry, the imminence of deadly harm was such that the present case is most extraordinary.

In these circumstances I would view the quoted charge of the trial court with such approval that if it or something like it had not been included in the general charge, I would have considered such deficiency as ample ground alone for reversal of the conviction.

Justice MOUNTAIN joins in this concurring opinion.

SCHREIBER, J. (concurring). The jury was correctly charged on the elements of first and second degree murder. The essential elements of first degree murder, premeditation, deliberation and willfulness, were carefully and fully defined. Complete explication of murder in the second degree and manslaughter followed. The court charged that "[e]ach individual mind has to arrive at [his] conclusion separately, and each juror, having in view the oath he has taken, and his and her duty and responsibility thereunder, should have his and her own mind convinced beyond a reasonable doubt upon all the evidence before he or she can conscientiously consent to a verdict of guilty." In its supplemental charge the jury was instructed:

The law contemplates that you shall by discussion harmonize your views if possible, *but not that you shall compromise*, divide, and yield your personal convictions for the purpose of arriving at an agreement. [emphasis supplied].

The jury's finding of not guilty of murder is consonant with the majority's opinion that there was not sufficient evi-

dence to justify a charge of first degree murder. The jury found as a fact that the elements of first and second degree murder were missing. The situation was the same as if the jurors had responded to written interrogatories in which they pronounced findings of no premeditation and no malice. The majority's conclusion that the manslaughter conviction was a compromise is sheer speculation and conjecture. Nothing in the record or the three verdicts reached supports the opinion that the jurors did not comply with the instruction that they were not to compromise their convictions. Nor can any such support be found to the effect that the jurors ignored their oaths of office and the trial court's instructions. Although the State's evidence with respect to self-defense was not very impressive, it was sufficient to cause submission of the question to the jury. It is pure fancy to intimate that they agreed upon a manslaughter verdict as a result of a settlement of different positions. Whether or not there was enough evidence to justify submission of the first degree murder charge to the jury is not relevant in ascertaining whether the jury compromised on reaching its result. In any event under the circumstances here, the error, if any, of submitting a first degree charge to the jury was harmless. *State v. Adams,* 50 *N. J.* 1 (1967); *State v. Moynihan,* 93 *N. J. L.* 253 (E. & A. 1919).

The majority has apparently adopted the Michigan rule that it is automatically reversible error for a trial judge to deliver a jury instruction on a criminal charge if there is insufficient evidence to support the instruction. *People v. Vail,* 393 *Mich.* 460, 227 *N. W.* 2d 535 (1975); *People v. Hansen,* 368 *Mich.* 344, 118 *N. W.* 2d 422 (1962); *People v. Marshall,* 366 *Mich.* 498, 115 *N. W.* 2d 309 (1962). I cannot assent to an inflexible principle which will not further the cause of justice and will add unnecessary trials to an already overburdened criminal judicial system.

There having been acquittals of murder, the manslaughter conviction was probably predicated on the defendant's use of

unreasonably excessive force in self-defense or defense of Mrs. French. The defendant in his argument on the motion for a new trial contended that the jury's conclusion of excessive force was against the weight of the evidence. The trial court denied the motion for the new trial by simply remarking that self-defense was a jury question. It did not expressly apply the proper principles to test whether a new trial was warranted, *State v. Sims,* 65 *N. J.* 359, 373–374 (1974), and the Appellate Division approved that action. It is assuredly appropriate for this Court to evaluate the record. *Dolson v. Anastasia,* 55 *N. J.* 2 (1969); *Kulbacki v. Sobchinsky,* 38 *N. J.* 435 (1962), concurring opinion of Justice Haneman, at 454, and dissenting opinion of Chief Justice Weintraub, Justice Jacobs and Justice Francis at 459.

When John French came to the defendant's mobile home in a drunken state shortly before 2:00 A.M. on October 1, 1972, it was not to visit his infant daughter. His banging on the storm door and shouting obscenities led to the defendant's phoning the police for aid. As the door was giving way the defendant went to the rear for his shotgun. On his return to the living room, he shot French who, having ripped two doors down, had entered the home and was moving toward Mrs. French or the defendant. What purpose could French have had to break into the home at that hour except to inflict harm on Mrs. French and the defendant? Both Mrs. French and the defendant justifiably feared him. The defendant, after warning French, had no other reasonable choice except to use his gun. He was under no duty to retreat before using deadly force. *State v. Bonano,* 59 *N. J.* 515, 518–522 (1971). A canvass of the entire record satisfies me that the verdict was against the weight of the evidence and it clearly and convincingly appears that there was a manifest denial of justice. *R.* 2:10–1 and *R.* 3:20–1.

I would reverse and remand for a new trial.

CONFORD, P. J. A. D., Temporarily Assigned (dissenting). I cannot concur in the court's judgment in this matter. I regard the sentence as excessive, however, and would reduce it, but otherwise would affirm the conviction of defendant for manslaughter.

It is held by the court that there was insufficient evidence to go to the jury on first degree murder and therefore submitting that charge to the jury was reversible error as having had the capacity to induce the jury to compromise on a manslaughter verdict rather than acquit. The position is one never heretofore advanced by defendant, even in his petition for certification. It is therefore cognizable by the court only on plain error grounds.

I find no error in the respect noted, much less plain error.

The controlling rule on the sufficiency of the State's proofs to make for a jury issue (or to withstand a motion for acquittal) in a criminal case, a rule not disputed by the majority, is that "the evidence and the inferences reasonably to be drawn therefrom must be viewed in a light most favorable to the prosecution. If, on such a consideration of the facts, the jury could reasonably find the accused guilty beyond a reasonable doubt", the ruling must be for the State. *State v Franklin*, 52 *N. J.* 386, 406 (1968); *State v. Mayberry*, 52 *N. J.* 413, 436–437 (1968); *State v. Fiorello*, 36 *N. J.* 80, 87–88 (1961). In applying this rule on review of a trial determination, allowance must also be made for the right of the jury to determine the weight and credibility of the testimony. *State v. Forcella*, 35 *N. J.* 168, 175 (1961).

The majority opinion appears to me, in effect, to disregard these fundamental principles of appellate review in criminal cases. This is made manifest by the recital of facts therein. Far from according the State the "most favorable" version of the proofs and inferences therefrom the opinion does the reverse. It gives the defense proofs the presumption of total credibility, accepts the testimony of defendant and Mrs. French as to defendant's conduct on October 1, 1972 (unrefutable because of the death of the dece-

dent) in its most innocuous light, and downgrades those State proofs, which, indulgently viewed, could permit a finding of a willful, deliberate and premeditated killing of the victim by defendant.

Under the proofs, the jury could have made or drawn any or all of the following findings or inferences. Defendant disliked the decedent and angrily told the Newton police chief, only two weeks before the killing, "I have a gun down at the tavern and I will shoot the son of a bitch." See *State v. Slobodian*, 120 *N. J. Super.* 68, 75 (App. Div.), certif. den. 62 *N. J.* 77 (1972). Defendant disliked the decedent not only because the latter was a drunken bully but because he was still married to defendant's paramour, was insisting on his court-ordered right to visit his child, then in Mrs. French's custody, and was an obvious nuisance and obstruction to defendant's free and unencumbered relationship with the woman. Defendant thus had a motive to eliminate the decedent. *Cf. State v. Seefeldt*, 51 *N. J.* 472, 488 (1968); *State v. MacFarland*, 83 *N. J. L.* 474 (E. & A. 1912); *State v. Abbatto*, 64 *N. J. L.* 658 (E. & A. 1900).

As to the protestations by both defendant and Mrs. French of their mortal fear of bodily harm at the hands of decedent, the jury had ample basis to discount this evidence substantially. Although they testified that decedent made numerous threats on their lives as well as on the life of his young daughter, the jury could have concluded there was no credible evidence of any attempt by decedent to execute such threats. They might have found that there were, at most, one or two isolated assaults on Mrs. French which apparently did not require medical attention.

Defendant prepared for decedent's anticipated visit to the trailer where defendant maintained Mrs. French, scheduled for September 30, 1972, by bringing a shotgun to the trailer and waiting for him there, even though decedent's previously declared purpose was only to visit his child. The jury could have well discredited defendant's testimony that the gun was not loaded until moments before decedent's

breaking into the trailer. The jury could also have taken notice of the tendency of pellets from a shotgun to disperse over a wide area, as particularly verified by the proofs that 22 pellets were removed from the chest of the victim during the autopsy. This, in turn, could substantially discredit defendant's testimony that he aimed for decedent's arm but struck his chest because of the latter's bodily movement, and could well support an inference that defendant formed the purpose, having previously deliberated on the subject while awaiting decedent's arrival, to kill decedent when and if he entered the trailer. In this regard, it is settled law in this State that "No particular length of time need intervene between the formation of the purpose to kill and its execution. It is not necessary that the deliberation and premeditation should continue for an hour or a minute. It is enough that the design to kill be fully conceived and purposely executed." *State v. Mangano*, 77 *N. J. L.* 544, 545, 546 (E. & A. 1909), cited in *State v. DiPaolo*, 34 *N. J.* 279, 295 (1961).

In reference to the decedent's conduct on the fatal morning a jury could have rejected any reasonable belief on the part of defendant that decedent, unarmed, represented such a threat of serious bodily harm either to defendant or Mrs. French as to have called for shooting him at the short range of a trailer living room with so lethal a weapon as a shotgun. Of defendant's contradictory statements as to what decedent was doing immediately prior to the shooting the jury could have credited the one that decedent was moving away from his wife, thereby, along with other circumstances, warranting a finding that the shooting was not for the purpose of protecting her but wanton and intentional.[1]

---

[1] It should be unnecessary for me to emphasize that the foregoing is not my own appraisal of the facts, that being inconsequential, but that which the trial court should properly have assumed the jury might make, within their fact-finding prerogative.

In sum, and without further extended illustration of my point from the proofs, the trial judge was well within the precedential guidelines cited above in submitting the issue of defendant's guilt of first-degree murder to the jury. But even if this were not so, one cannot lightly jump to the conclusion of reversible error. I am willing to concede the substantiality of the court's thesis that it is possible, in a given case, that the submission to a jury of an unwarranted charge of first degree murder where the proofs are susceptible of a finding of innocence may lead to a compromise verdict of a lesser degree of guilt rather than the acquittal which the jury would otherwise have returned. But the court here fails to appraise the likelihood that such a result transpired below by the established criterion of whether there was a "real" possibility that, or a "reasonable" doubt as to whether, the error led the jury to a result it otherwise might not have reached. *State v. Macon,* 57 *N. J.* 325, 336 (1971). In the terms of the practice rule, error is to be disregarded on appeal unless "clearly capable of producing an unjust result." *R.* 2:10–2. Administration of those criteria must be made in the light of the entire record. So viewed, I would not find the error, if conceded, to be reversible. I believe the strong probability is that the jury determined that the defendant feared attack by decedent and intended to act in self-defense or defense of Mrs. French, but used unreasonably excessive force in that endeavor. The defendant lacking malice, the jury found him guilty of manslaughter rather than murder, following the trial court's instructions in that regard. In short, I fail to discern any reasonable possibility that the manslaughter verdict in this case was a compromise one rather than a true assessment by the jury of the degree of defendant's culpability under the evidence.

Although I would, accordingly, not reverse the conviction, I would reduce the sentence of imprisonment imposed by the trial court. Defendant has no criminal background, is a prime subject for rehabilitation, and was found by the jury, in effect, to have had no malicious intent in this

unfortunate episode. In that light a prison sentence of 4-6 years is clearly excessive. *State v. Bess,* 53 *N. J.* 10 (1968). I would reduce the sentence to one to two years.

The observation of the majority that my conclusion for reduction of the sentence is "clearly anomalous for a crime which the dissent would otherwise portray as a cold-blooded murder" is not valid. My position as to sentence is predicated on the jury's actual decision that the crime committed was manslaughter, not murder. I should have thought it obvious that my view as to the sufficiency of the evidence in relation to a charge of murder was founded on a view of the proofs which the jury *might* legitimately take. I have expressly emphasized, in footnote 1, *supra,* that that analysis of the proofs does not necessarily reflect my own findings of fact, which would be "inconsequential".

Without detailing defendant's other assertions of error, I find no merit in any of them.

Justice CLIFFORD joins in this opinion.

HUGHES, C. J., and SCHREIBER, J., concurring in the result.

*For reversal*—Chief Justice HUGHES, and Justices MOUNTAIN, SULLIVAN, PASHMAN and SCHREIBER—5.

*For affirmance*—Justice CLIFFORD and Judge CONFORD—2.