## PEOPLE v VAIL

Docket No. 55320. Argued December 10, 1974 (Calendar No. 6).— Decided April 7, 1975.

George H. Vail was charged with first-degree murder for his participation in a shooting which caused the death of David Rivas. Defendant was found guilty of voluntary manslaughter by a jury in Oakland Circuit Court, Philip Pratt, J. The Court of Appeals, J. W. Fitzgerald, P. J., and T. M. Burns and Adams, JJ., affirmed (Docket No. 14986). Defendant appeals, contending that there was insufficient evidence for the jury to find defendant guilty of first-degree murder and that it was error to deny his motion to dismiss the count charging murder in the first degree. *Held:* Under the facts of this case, the trial judge erred in refusing to grant defendant's motion for a dismissal of the first-degree murder count where the proofs were insufficient to establish the elements of premeditation and deliberation.

Reversed and remanded for retrial.

M. S. Coleman, J., dissented on the ground that the totality of the evidence suggests that the jury could have found first-degree murder if it believed some witnesses, or voluntary manslaughter if it believed others, and it was the function of the jury, not of the Supreme Court, to make the determination.

49 Mich App 578; 212 NW2d 268 (1973) reversed.

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 40 Am Jur 2d, Homicide §§ 485, 486, 488, 489.
    75 Am Jur 2d, Trial § 745 *et seq.*
[2] 75 Am Jur 2d, Trial § 544 *et seq.*
[3, 6] 40 Am Jur 2d, Homicide §§ 439, 472.
    Homicide: presumption of deliberation or premeditation from the circumstances attending the killing. 96 ALR2d 1435.
[4] 75 Am Jur 2d, Trial §§ 321, 434.
[5] 40 Am Jur 2d, Homicide § 454.
[7] 40 Am Jur 2d, Homicide § 470.
[8] 75 Am Jur 2d, Trial § 319 *et seq.*

OPINION OF THE COURT

1. HOMICIDE—MANSLAUGHTER—MURDER—INSTRUCTIONS TO JURY.

A conviction of voluntary manslaughter is reversed and the case remanded to the circuit court for retrial where the trial court was in error in instructing the jury to consider a charge of first-degree murder because that charge was unsupported by the evidence.

2. CRIMINAL LAW—INSTRUCTIONS TO JURY—PREJUDICE—COMPROMISE VERDICT—DIRECTED VERDICT OF ACQUITTAL.

There is always prejudice where a jury is permitted consideration of a charge unwarranted by the proofs because a defendant's chance of acquittal on any valid charge is substantially decreased by the possibility of a compromise verdict; for this reason it is reversible error for a trial judge to refuse a directed verdict of acquittal on any charge where the prosecution has failed to present evidence from which the jury could find all elements of the crime charged.

3. HOMICIDE—MURDER—FIRST DEGREE—PREMEDITATION—DELIBERATION.

Premeditation and deliberation must be given independent meaning in a prosecution for first-degree murder; they characterize a thought process undisturbed by hot blood, and while the minimum time necessary to exercise this process is incapable of exact determination, the interval between initial thought and ultimate action should be long enough to afford a reasonable man time to subject the nature of his response to a second look (MCLA 750.316).

DISSENTING OPINION

M. S. COLEMAN, J.

4. HOMICIDE—MURDER—FIRST DEGREE—APPEAL AND ERROR—WITNESSES—CREDIBILITY.

*It is not the function of the Supreme Court to assess the credibility of witnesses nor to determine if witnesses have been successfully impeached at a first-degree murder trial, but that of the jury; the function of the Court is to determine whether there was any evidence produced at trial which would support a charge of first-degree murder.*

5. HOMICIDE—MURDER—MANSLAUGHTER—JURY.

*It is within the province of the jury to determine the quantity of proof necessary to reduce a crime of murder to manslaughter.*

6. Homicide—Murder—Premeditation—Question of Fact.

> *The question whether facts were sufficient to establish that a defendant had engaged in the thought process necessary to classify a homicide as premeditated and deliberate murder was for a jury to decide, not a court.*

7. Homicide—Murder—First Degree—Manslaughter—Instructions to Jury.

> *A defendant's conviction of manslaughter should be affirmed where the jury was instructed on the elements required in each of the three degrees of homicide as well as accident and self-defense and the totality of the evidence suggests that the jury could have found first-degree murder if it believed some witnesses, or voluntary manslaughter if it believed others.*

8. Trial—Jury—Courts—Division of Functions.

> *The division of functions between court and jury is one which is essential to the safe administration of justice.*

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *L. Brooks Patterson,* Prosecuting Attorney, and *T. S. Givens,* Deputy Appellate Counsel, for the people.

*Douglas Chartrand,* for defendant.

T. M. KAVANAGH, J. Defendant, George Herbert Vail, was charged with first-degree murder[1] for his participation in a shooting incident which caused the death of David Rivas. Tried in Oakland County Circuit Court, defendant was found guilty of voluntary manslaughter by a jury on June 16, 1970 and he was later sentenced to a prison term of 7-1/2 to 15 years. His appeal to the Court of Appeals[2] resulted in affirmance on September 25, 1973. This Court granted the defendant's application for leave to appeal on March 21, 1974.[3]

As we are convinced that the trial court was in

[1] MCLA 750.316; MSA 28.548.

[2] *People v Vail,* 49 Mich App 578; 212 NW2d 268 (1973).

[3] *People v Vail,* 391 Mich 789 (1974).

error for instructing the jury to consider the charge of first-degree murder, we must reverse the defendant's conviction and remand the case to the circuit court for retrial.

*Issue:*

The issue we find decisive[4] was raised on several occasions during the course of the trial by means of a motion to dismiss the first-degree murder charge. Each time the defense offered such a motion it was denied. Stated succinctly the issue reads:

*Taking the evidence in the light most favorable to the prosecution was there any evidence upon which a jury could predicate a finding of guilty of murder in the first degree?*

The parties are in conflict on the facts only; there is no dispute about the law in this case. Both the prosecution and the defense agree that if the evidence is found to be lacking, reversal is required. This Court has so held on numerous occasions. *People v Stahl,* 234 Mich 569; 208 NW 685 (1926); *People v Marshall,* 366 Mich 498; 115 NW2d 309 (1962); *People v Hansen,* 368 Mich 344; 118 NW2d 422 (1962).

Perhaps the best explanation for the logic of this rule is found in *People v Gessinger,* 238 Mich 625, 628; 214 NW 184 (1927), where Justice BIRD, writing for the majority, stated:

"I think it is evident to most practitioners of experience that it would be much easier to secure an acquittal if the defendant were only charged with the lesser

---

[4] Defendant raised five issues in this appeal. Because we reverse on this issue we do not consider any of the other issues.

offense than it would be were he charged with all three offenses. The tendency of jurors is to compromise their differences. Where there is only one charge they are obliged to meet the question squarely by yes or no, or disagree, but where the charges are three, the juror who thinks there should be no conviction, and the juror who thinks that a conviction should be had of the greater offense are quite liable to agree upon a conviction of the lesser offense."

Thus, where a jury is permitted consideration of a charge unwarranted by the proofs there is always prejudice because a defendant's chances of acquittal on any valid charge is substantially decreased by the possibility of a compromise verdict. For this reason it is reversible error for a trial judge to refuse a directed verdict of acquittal on any charge where the prosecution has failed to present evidence from which the jury could find all elements of the crime charged.

*Facts:*

While the facts are complex[5] and the testimony, at times, conflicting, the entire transaction which preceded the slaying can be split into three separate and distinct incidents. These incidents: *The Robbery, The Firebombing,* and *The Shooting Incident,* all occurred between the hours of 10 p.m. on August 26, 1969 to 1 p.m. on August 27, 1969 at the home of the defendant in the City of Hazel Park.

### The Robbery

During the evening of August 26, 1969 between

[5] For simplicity we summarize the testimony into its separate parts. For a more detailed report of the individual witnesses' testimony, *see People v Vail, supra,* footnote 2, pp 583–588.

10 and 11 p.m., three men, Martin Ray, William
Powley and Mike "Indian Joe" Lichtenberg, ar-
rived at defendant's home. As the three men en-
tered the darkened house they were confronted by
two men with pistols and ordered to lie face down
on the floor. While in this position each victim had
a large amount of cash removed from his person
by one of the two armed assailants. The victims
were then instructed to crawl from the house and
not to return.

One of the victims of the robbery, Martin Ray,
testified that the defendant, during the course of
the robbery, had threatened him with a pistol and
had warned him "not to try anything funny be-
cause he had the right to shoot us because we
were trespassing in his home".

Ray further testified that after the victims left
the defendant's house they went to a telephone
booth and called the defendant to demand the
return of their money. During this conversation
the defendant disclaimed any knowledge of the
victims or the robbery.

### The Firebombing

After the unsuccessful phone call, Ray visited a
friend, Robert Lockhart, and persuaded him to
return with Ray to the scene of the robbery. The
two men arrived outside defendant's house at ap-
proximately 2 a.m. on August 27, 1969 (about
three–four hours after the robbery). They were
armed with at least two gasoline-filled soft-drink
bottles. After igniting the fuses, both Ray and
Lockhart threw their flaming bottles onto the roof
and quickly departed.

Just before the bombing, the activity inside
defendant's house had all but ceased for the eve-

ning. Defendant, Stevens and William Brown, a friend of the defendant, were watching television in the living room while the remaining occupants, defendant's wife, his two children, and another friend identified only as "Myra" were in the bedrooms.

Suddenly Stevens saw a figure holding a fiery object emerge from the darkness on the front lawn. As the attacker began to throw the bombs, Stevens alerted the others of the danger.

When the firebombs struck the roof and the resultant flames started to engulf the front of the home, defendant hurried to the front bedroom to rescue his family. Defendant first roused his wife and then he removed his ten-day-old son from the endangered room.

In the confusion that followed, defendant reentered the bedroom, grabbed his hunting rifle from the closet, loaded it and began to run from the room. However, he stumbled on the carpet and fell to the floor. The impact with the floor caused the rifle to discharge accidentally. Defendant then telephoned the Hazel Park Police Department and waited inside the house until police officers arrived at the scene. He then exited the house to extinguish the remaining flames, and to speak to the police. After their investigation was completed the officers departed and the defendant returned to his home.

## The Shooting Incident

During the morning after the firebombing, August 27, 1969, defendant decided to move himself and his family to his mother-in-law's house to protect them from any further assaults. His wife

and children left the house around 7:30 a.m., but he and the others present remained to pack the items that would be needed during their absence.

At approximately 1:30 p.m., defendant Brown and Stevens were packing items in the living room when a car containing four men stopped in front of defendant's house. Robert Lockhart was driving the car. Also seated in the front of the car was Martin Ray who was armed with a .22 pistol. In the back seat, behind the driver, was Ray's brother-in-law, David Rivas. Rivas was armed with a sawed-off shotgun. William Powley, the fourth man in the car, was seated next to Rivas. The car was parked on the lefthand side of the street facing oncoming traffic. From inside the car, Ray and Rivas shouted demands for the return of the stolen money.

When the car first arrived the defendant observed the sawed-off shotgun protruding from the left rear window. Stevens and Brown sought cover in the living room. As the defendant went into the bedroom to get his rifle, a telephone call was made to the Hazel Park Police Department to advise them of the incident. With the police on the line, the defendant cautiously approached the doorway in order to get a better description of the automobile and its occupants. At this point shots were exchanged. While there is some conflict concerning certain facts, all witnesses agreed that (1) Rivas fired the first shot, and (2) defendant fired the second shot. It is also agreed that Rivas' shotgun blast struck the front of defendant's home while defendant's bullet penetrated the left side of the car and struck Rivas, inflicting the fatal injury. After the shots, the car departed and defendant went to the telephone to report the shooting to the police.

*The First-Degree Murder Charge*

The Legislature has defined the crime of first-degree murder as:

"All murder which shall be perpetrated by means of poison, or lying in wait, or any other kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration, or attempt to perpetrate any arson, rape, robbery or burglary, shall be murder of the first degree, and shall be punished by solitary confinement at hard labor in the state prison for life." MCLA 750.316; MSA 28.548.

In the context of this prosecution, the Legislature intended the elements of *premeditation* and *deliberation* to distinguish the offense of first-degree murder.[6] In *People v Morrin,* 31 Mich App 301; 187 NW2d 434 (1971), then Judge, now Justice LEVIN considered the importance of the distinction and the nature of these elements:

"First-degree and second-degree murder are separate offenses, carrying vastly different penalties, distinguished only by the requirement that a homicide punishable as first-degree murder be committed with premeditation and deliberation. If premeditation and deliberation are ill-defined, the jury is left with no objective standards upon which to base its verdict.

* * *

"Accordingly, it underscores the difference between the statutory degrees of murder to emphasize that premeditation and deliberation must be given independent meaning in a prosecution for first-degree murder. The ordinary meaning of the terms will suffice. To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem. As a number of courts have pointed out, premeditation and deliberation characterize a thought

---

[6] MCLA 750.317; MSA 28.549.

process undisturbed by hot blood. While the minimum time necessary to exercise this process is incapable of exact determination, the interval between initial thought and ultimate action should be long enough to afford a reasonable man time to subject the nature of his response to a 'second look'." (pp 328–330.)

The prosecution contends that the record clearly reflects sufficient evidence for the jury to have inferred the presence of premeditation and deliberation.

The facts the prosecution relies on to prove these elements are:

1. Defendant's threat to shoot the robbery victims.

2. Ray's telephone conversation with defendant.

3. The gunshot that occurred during the firebombing.

4. Defendant's failure to report that gunshot to responding officers.

5. Defendant's wife and children left the home before the shooting incident which caused Rivas' death.

6. That two or three minutes could have elapsed between Rivas' shot and defendant's shot.

7. The fact that the car was accelerating away at the time defendant shot.

It is urged that these facts, together with all reasonable inferences, could have supported a jury finding of first-degree murder. We disagree. These facts are insufficient to establish that the defendant had engaged in the required mental thought process necessary to classify the homicide as a premeditated and deliberate murder.

The facts listed above must be considered in the context in which they occurred. Defendant's threat to shoot the robbery victims occurred during an

armed robbery. When viewed in this context, the
threat was not evidence of a premeditated and
deliberate intent to kill, but rather a variation of
the classic highwayman's demand, "Your money
or your life!"

The prosecution urges that items 1–5, when
considered together, support a finding that defend-
ant expected a future encounter and that he pre-
pared a "cold-blooded plan" to do battle with his
adversaries upon their return. However, while we
agree that defendant may have reasonably antici-
pated future difficulties with Ray and his compan-
ions, the record indicates that defendant sought to
avoid doing battle with them. On two occasions
defendant called upon the Hazel Park police for
aid, and after the firebombing defendant decided
to move himself and his family to safer quarters.
Defendant sent his wife and children away at
dawn while he and the other occupants of the
house remained to pack the necessary items for
their absence. It was during the packing that Ray
and his cohorts returned and the shooting incident
occurred.

The evidence concerning the possible two- to
three-minute lapse between shots comes from the
testimony of William Brown. On direct examina-
tion by the prosecutor, Brown testified:

"*Q.* How much time lapsed between the shots?
"*A.* I couldn't say.
"*Q.* Well, was it a half an hour?
"*A.* No, maybe two to three minutes."

Apparently Brown had some difficulty in recall-
ing the exact details of the shooting incident. In
order to assist Brown's memory, the prosecution
produced a statement Brown had given to the

police on the day of the shooting. Brown admitted making the statement, that the statement was true and that his memory at the time of the statement was better than his present recollection of the incident. The prosecution then endeavored to refresh Brown's recollection of the shooting incident.

"*Q.* I direct your attention to six lines up from the bottom on page 2, and ask if you recall—

\* \* \*

"*Q. (By Mr. Murphy):* Do you remember that?
"*A.* Yes.
"*Q.* Is it true?
"*A.* Yeah.
"*Q.* You then heard the car accelerate after the shotgun blast, you heard the car accelerate?
"*A.* Yes."

Clearly, Brown's refreshed testimony is in conflict with his prior estimate of a two- to three-minute lapse between the shots. If the car sped away defendant could not possibly have waited so long to fire his rifle. However, the prosecution had good reasons to establish that the car departed after the shotgun blast: (1) there was little hope that the jury would believe the two- to three-minute lapse existed because every other witness testified that the shots were almost simultaneously fired, and (2) evidence that the car was departing could be used by the prosecution to refute defendant's self-defense arguments.

Brown's statement about a two- to three-minute lapse stands in irreconcilable conflict with his later testimony that the automobile departed rapidly after the first shot. While logic alone dictates a conclusion that a rapidly departing automobile would have sped out of range within a matter of

seconds, the testimony of the surviving occupants of the car and the evidence of the bullet hole in the side of the car support a sole conclusion that defendant did not delay his shot.

Although the facts surrounding the shooting incident, and Brown's testimony in particular, might not convince a jury that the death was justified as self-defense, these facts present no evidence to support a finding of premeditation and deliberation on the part of the defendant. Most damaging to the prosecution is the fact that the defendant was required to formulate the decision to shoot as the car sped away. Even assuming some time gap between the shots, the testimony that the car was rapidly departing, rather than establishing premeditation and deliberation, negates such a finding. Under the circumstances the defendant was forced to make an impulsive, sudden, and hasty decision to shoot before the car could speed out of range.

Long ago this Court decided that this type of quick decision does not support a charge of first-degree murder. In *Nye v People,* 35 Mich 16, 18 (1876), this Court said:

"There is much learning and some subtlety in the older books upon the question whether a sudden homicide could be properly classed as murder, because that requires malice aforethought. The courts decided that the real test of malice in such cases was to be found in the presence or absence of adequate cause or provocation to account for the violence, and that an unprovoked homicide, however suddenly conceived, might be malicious. In other words, malice aforethought did not mean deliberate and calculating malice, but only malice existing at any time before the act so as to be its moving cause or concomitant.

"In dividing murder into degrees, its common-law qualities are not changed, but (except in special cases)

the division is chiefly between cases where the malice aforethought is deliberate and where it is not. It was rightly considered that what is done against life deliberately indicates a much more depraved character and purpose than what is done hastily or without contrivance. *But it is a perversion of terms to apply the term deliberate to any act which is done on a sudden impulse.*" (Emphasis supplied.)

We conclude that the charge of first-degree murder was unsupported by the evidence and for that reason defendant's conviction of manslaughter must be reversed and the case is remanded to the circuit court for retrial.

T. G. KAVANAGH, C. J., and SWAINSON, WILLIAMS, and LEVIN, JJ., concurred with T. M. KAVANAGH, J.

M. S. COLEMAN, J. *(to affirm).* The defendant was charged with first-degree murder. The jury was instructed on the elements required in each of the three degrees of homicide as well as accident and self-defense (which defendant maintained). Defendant was found guilty of voluntary manslaughter. The issue is whether there was any evidence introduced at trial from which the jury could have concluded that the defendant was guilty of first-degree murder.

This fact situation is complicated by conflicting testimony, so I could not state the situation so surely as was done in the majority opinion. Not mentioned was the fact that defendant's bullet hit the left rear quarter panel portion, the entry being oval in shape. The shot was therefore from an angle. Also not mentioned was the testimony of Dr. Olson, a pathologist, that the bullet entered the back of the deceased. Further, one witness testified that there were two or three minutes

between the shot from the car and defendant's shot. The driver of the car testified that he was driving away from the house and had accelerated when defendant's shot was fired.

There has been expressed a belief that prosecutors sometimes charge more than they can prove, possibly as pressure for a guilty plea or as a ploy to influence the jury to convict. In any event, that is not true in this case. Defendant did not plead guilty. The jurors could have found premeditation had they believed some of the witnesses.

Will we order reversal in all cases where the prosecutor fails to convince a unanimous jury that a defendant is guilty of the higher charge; or where the jurors believe some witnesses and not others giving conflicting testimony (as here); or where jurors consider the equities and inject the "quality of mercy"?

The majority of my colleagues analyzed and weighed the evidence of premeditation. They concluded that there was no evidence of premeditation but they arrived at that conclusion only by showing why the evidence of premeditation should not have been believed. They agree that there is a conflict of facts. ("The parties are in conflict on the facts only; there is no dispute about the law * * * .")

It is not our function to assess the credibility of witnesses nor to determine if witnesses have been successfully impeached. That is the jury's function. Our function is to determine whether there is any evidence produced at trial which would support a charge of first-degree murder. This division of functions was, before today, cemented in our jurisprudential system.

Justice Campbell in *Sheahan v Barry,* 27 Mich 217, 226 (1873), was unequivocal:

"The division of functions between court and jury is one which is essential to the safe administration of justice, and a new trial will always be granted when the judge interferes with the lawful province of the jury. He has no right to take away from them the decision of any question of fact, and he cannot deprive them of the right to settle for themselves what witnesses or what testimony they will credit or discredit. This would be clearly error."

It is within the province of the jury to determine the quantity of proof necessary to reduce a crime of murder to manslaughter. The Court in *People v Toner*, 217 Mich 640; 187 NW 386 (1922), established that

"it was the province of the jury and not of the court to decide whether there was much or little testimony which would reduce the crime from murder to manslaughter. [While] there [may be] little testimony to reduce the crime to manslaughter, * * * [i]t was for the jury to measure the quantity of proof."

This view was reinforced in *People v Vanderhoof*,[1] 234 Mich 419; 208 NW 458 (1926):

"It will suffice to say that the testimony justified submitting the case to the jury on the charge of murder, and whether the testimony bearing on that charge was much or little was for the jury and not for the court."

In the instant case the trial judge and a unanimous Court of Appeals agreed that the jury reasonably could have concluded that the defendant

---

[1] To the same effect, *see People v Collins*, 303 Mich 34; 5 NW2d 556 (1942), and *People v Burkard*, 374 Mich 430; 132 NW2d 106 (1965).

was guilty of first-degree murder.[2]

My colleagues find that the seven enumerated facts (plus others) which were the basis of the prosecution's charge of first-degree murder were "insufficient to establish that the defendant had engaged in the required mental thought process necessary to classify the homicide as a premeditated and deliberate murder". But that was the precise question for the jury to decide, not the court. The prevailing opinion discusses at length the believability of the testimony. We now become the jury as well as the judge.

Among the questions which flow from the opinion are: (1) Because the jury did not find second-degree murder, was that charge also erroneous? (2) Should the prosecutor be precluded from the right to charge first-degree murder because he may have presented evidence and information which for some reason did not "come through" at trial?

[2] The Court of Appeals analysis is presented at 49 Mich App 578, 590; 212 NW2d 268 (1973), as follows:

"The testimony adduced at trial pertaining to the defendant's deliberation and premeditation may be capsulized as follows: The defendant during the course of the armed robbery at his home told the victims he could kill them for trespassing. On the afternoon following the robbery a vehicle containing four men drove up in front of the defendant's home. Someone in the defendant's house stated that one of the individuals in the auto had a shotgun. The defendant procured a rifle. A passenger in the vehicle shouted instructions to the defendant to return the money taken on the previous evening. Defendant appeared in the doorway. A shotgun blast from the vehicle was directed at the defendant's residence. One witness who was in the defendant's home at the time testified that there was a lapse of from two to three minutes before the defendant returned fire. The vehicle was accelerating away from the defendant's home at the time he fired the fatal shot. From this evidence it is our opinion that it would have been possible for a jury to reasonably conclude that since there was a two or three minute interval between the shots and inasmuch as the vehicle from which the shotgun blast was fired was driving away from the defendant's residence, there was sufficient time for the defendant to form the intent to kill and an opportunity for the defendant to reconsider the matter and not fire the rifle. Therefore sufficient evidence was presented from which a jury could reasonably have inferred that the defendant acted willfully, deliberately and with premeditation."

Although I do not wish to belabor the point, some passages from the prevailing opinion are significant. One which seeks to analyze the question for the jury is:

"Most damaging to the prosecution is the fact that the defendant was required to formulate the decision to shoot as the car sped away. [I cannot explain how this was damaging to the *prosecution.]* Even assuming some time gap between the shots, the testimony that the car was rapidly departing, rather than establishing premeditation and deliberation, negates such a finding. Under the circumstances, the defendant was forced to make an impulsive, sudden, and hasty decision to shoot before the car could speed out of range." (They might have *escaped!)*

The totality of the evidence suggests to me that the jury could have found first-degree murder if it believed some witnesses, or voluntary manslaughter if it believed others. It chose the latter and our Court does not dispute the appropriateness of the decision. Nevertheless, the Court reverses a proper verdict for the very reason that it agrees with the jurors.

I would affirm defendant's manslaughter conviction and abstain from the emasculation of what was before today the exclusive function of the jury —to evaluate the evidence placed before it. I agree with Justice Campbell that "[t]he division of functions between court and jury is one which is essential to the safe administration of justice".