COURT OF APPEALS

| | |
|---|---|
| PEOPLE OF THE STATE OF MICHIGAN, | UNPUBLISHED<br>July 21, 2015 |
| Plaintiff-Appellee, | |
| v | No. 320768<br>Grand Traverse Circuit Court |
| ROBERT JENSEN SCHWANDER, | LC No. 2011-011239-FC |
| Defendant-Appellant. | |

Before: GLEICHER, P.J., and K. F. KELLY and SERVITTO, JJ.

PER CURIAM.

Defendant Robert Jensen Schwander returns to this Court for the third time, following a second remand for resentencing. Unfortunately, the third time is not the charm. Because the resentencing court failed to articulate legally cognizable grounds justifying the extent of the substantial departure sentence it imposed, we must once again remand for resentencing. To preserve the appearance of fairness, defendant's resentencing shall be conducted by a different judge.

I. FACTUAL AND PROCEDURAL OVERVIEW

Our previous opinion details the tragic and gruesome facts of this case. *People v Schwander*, unpublished opinion per curiam of the Court of Appeals, issued January 31, 2013 (Docket No. 307921) (*Schwander I*). We recapitulate only those facts pertinent to this appeal.

The prosecution charged defendant, age 17, with open murder for the death of Carly Lewis. In her opening statement, the prosecutor urged the jury to convict defendant of murder in the first degree. He "never really liked Carly," the prosecutor asserted, "blamed her for being kicked out of their house" and "convinced her to go with him to a secluded area" where he stabbed her 10 times. The prosecutor's closing argument reprised that theme: defendant "wanted to kill" Carly, hatched an elaborate plot to lure her to a place where he could murder her without detection, and mercilessly stabbed her to death, fueled by hatred.

Defendant testified in his own behalf and insisted that he had not stabbed Carly. He claimed that Carly had initiated a physical altercation and that he became "so out of control" that he beat and then strangled her. The pathologist who conducted the autopsy, Dr. Stephen Cohle, testified that Lewis had, in fact, been stabbed multiple times, and that a stab wound to the chest caused her death. A pathologist who testified on behalf of the defense, Dr. Bader Cassin, opined

that it was "possible" that Carly had died due to a stabbing chest wound, but he found no strong evidence of it when reviewing the autopsy report and photographs. Alternatively, Dr. Cassin advanced the possibility that the wounds detected by Dr. Cohle were caused by the sharp end of a probe used by the police while searching the ground for her body. Dr. Cassin told the jury that the autopsy results were also consistent with death by strangulation.

The jury convicted defendant of second-degree murder, MCL 750.317, thereby rejecting that defendant had premeditated or deliberated Carly's killing. This verdict removed a mandatory life without parole sentence from the range of sentencing options, triggering the application of Michigan's legislative sentencing guidelines.

Pursuant to the guidelines, Grand Traverse Circuit Judge Thomas Power calculated defendant's second-degree murder sentence by assigning points for the applicable prior record (PRVs) and offense variables (OVs). Defendant received a zero PRV score because he had no prior convictions or juvenile adjudications. Judge Power assessed a large number of OV points.

Judge Power then plugged defendant's PRV and OV scores, respectively zero and 110, into the applicable sentencing grid. As so scored, the guidelines called for a minimum sentence range between 162 and 270 months' imprisonment (13.5 to 22.5 years), or life. Judge Power opted to impose a term-of-years sentence rather than life imprisonment. He departed from the top of the minimum-sentence range called for by the guidelines, levying a minimum sentence of 40 years' imprisonment with a maximum term of 70 years. Judge Power identified his "principal reason for departing" as his factual finding that Lewis's death was "by stabbing," and that she remained in the process of dying for half an hour. During that interval, Judge Powers found, "she could have been saved, which [defendant] wouldn't necessarily know." Defendant's failure to summon aid, Judge Powers opined, "is particularly cruel and soulless. And that is not considered in the guidelines."

Defendant appealed only his sentence, challenging the scoring of several offense variables and the extent of the sentence departure. A different panel of this Court rebuffed defendant's guideline challenge, finding the scoring within Judge Powers' discretion. This Court further held that although Judge Power elucidated two appropriate reasons for departing from the guidelines' sentence, he neglected to justify the extent of the departure sentence imposed. The Court remanded for resentencing, instructing Judge Power to articulate his justification for the "extraordinary departure" sentence it selected. *Schwander I*, unpub op at 5.

On first remand, Judge Power announced that he was "unable to improve upon the reasons for the departure." He sentenced defendant to 38 to 70 years' imprisonment, concluding: "The undersigned is hopeful that this substantial reduction in the Defendant's sentence will prove satisfactory to the Court of Appeals." It did not. We again vacated the sentence and remanded for resentencing before a different judge. *People v Schwander*, unpublished order of the Court of Appeals, entered April 9, 2013 (Docket No. 307921). On second remand, Judge Philip E. Rodgers, Jr., reinstated Judge Power's original departure sentence of 40 to 70 years' imprisonment.

Judge Rodgers commenced defendant's resentencing by outlining the "substantial, compelling and objective reasons" for a departure sentence. Echoing Judge Power, Judge

Rodgers found "the depravity and the stabbing death of this young woman, which took her 30 to 60 minutes to die," a reason for departure. "First aid was not provided," Judge Rodgers continued, which "probably would have saved her life." Additionally, defendant "gross[ly]" abused the trust of the victim's family, and showed no remorse. "Fourth," Judge Rodgers continued, "there was a 12 day search for the victim. And, the publicity generated reasonable community fear for the safety of other children not knowing how or why Ms. Lewis had disappeared." Next, "after death the body was treated with what can only be described as complete and utter disrespect." Lastly, Judge Rodgers observed, the Department of Corrections recommended an upward departure.

Judge Rodgers then turned to the "principles of proportionality" which supported the extent of the departure sentence he intended to impose. Addressing defendant, he began "by . . . determining who you are:"

> And, I look at your prior record variable score and I see that that's zero, that can mean a variety of things. That could mean you were one free of prior criminal behavior, an innocent man caught in circumstances that were overwhelming, who out of anger and spite murdered another human being, that however is not you.
>
> I looked carefully at this record. What this record reflects, among other things, is prior multiple acts of criminal sexual conduct in the third degree, which were scored in the offense variables as a continuing pattern of criminal behavior. They weren't scored in the prior record variables because there were no convictions, but they are recorded in the diary and in the testimony of your girlfriend, Ms. Tezak. Page 1 of your original pre-sentence report reflects that you made a threat to a corrections officer and his family while confined in the county jail awaiting trial. And, your pre-sentence report also indicates due to escalating negative behavior in the school your own high school principal was afraid of you. So you were, then, at the time this occurred a person who committed a series of high severity felonies and whom others legitimately feared. I emphasize this only because the principles of proportionality that derive from *Milbourn*[1] recognize that more serious sentences should be for people who not only commit the most serious crimes, but for whom the community should have a reasonable fear.
>
> Not as important were the concurrent offenses of larceny in a building from the Lewis home, trespass, vandalism and the theft of electricity from a structure you did not own. And, the prior provision on at least one occasion of providing marijuana to a minor.[2]

---

[1] *People v Milbourn*, 435 Mich 630; 461 NW2d 1 (1990).

[2] Defendant was never charged with larceny, trespass, vandalism, the theft of electricity, or providing marijuana to a minor.

Judge Rodgers moved on to the manner of Lewis's death. Again speaking to defendant, Judge Rodgers queried:

> So which is more depraved, stabbing a victim multiple times and watching her slowly bleed to death or choking her to the point where she became unconscious and could no longer fight or resist, continuing to do so for two additional minutes then dropping the body, going for a walk and returning finally to allegedly doing some chest compressions. That's the trial record. In either case the level of depravity is stunning.

Next, Judge Rodgers determined that because defendant had actually committed first-degree murder, a sentence substantially above the guidelines was proportionate to the crime:

> You were initially charged with murder in the first degree, the premeditated and deliberate killing of another. What does that actually mean? People like me, juries, have been directed to the Michigan Supreme Court opinion in *People versus Vail*, it's an old opinion, a 1975 opinion of the Michigan Supreme Court, 393 Michigan 460. And, I would direct you to pages 468 and 469. Premediated is to think about beforehand. To deliberate is simply to measure and evaluate facts. But, the important part of the *Vail* decision reads as follows, while the minimum time necessary to exercise this thought process is incapable of exact determination the interval between thought and ultimate action should be long enough to afford a reasonable man time to subject the nature of his response to a second look.[3]
>
> Let me read that last part to you again, the interval between thought and ultimate action should be long enough to afford a reasonable man time to subject the nature of his response to a second look.

Judge Rodgers then described the process of strangulation that defendant claimed had occurred. That process, Judge Rodgers indicated, would have taken more than two minutes—"a long enough interval to give a reasonable man time to subject the nature of his response to a second look." Judge Rodgers continued:

---

[3] The quotation is actually from *People v Morrin*, 31 Mich App 301, 330; 187 NW2d 434 (1971). Judge Rodgers omitted the sentence immediately before the language he quoted: "As a number of courts have pointed out, premeditation and deliberation characterize a thought process undisturbed by hot blood." *Morrin* was authored by then Judge, later Justice, Charles Levin. In *People v Vail*, 393 Mich 460, 468-469; 227 NW2d 535 (1975), the Supreme Court cited the entire quotation approvingly, holding in that case that the facts were "insufficient to establish that the defendant had engaged in the required mental thought process necessary to classify the homicide as a premeditated and deliberate murder." The Supreme Court overruled a different aspect of *Vail* in *People v Graves*, 458 Mich 476; 581 NW2d 229 (1998).

What you actually did was stab her to death and sit there a half an hour and watch her bleeding, the lung punctured, the blood and foam coming out of her mouth. Clearly, there was adequate time to give a reasonable man the interval to reflect upon his actions.

So in my view by a preponderance of the evidence, which is the standard we use for purposes of sentencing, this was a first degree murder and a departure because of the far more serious crime of 600 to 900 months, or 50 to 75 years, is not only legally justifiable it's consistent with who you are, what you did and your projected life expectancy. I will be candid with you, I hesitate to impose that sentence, or even 493 to 840 month sentence which the guideline analogy would mathematically support, because I believe it would be honestly found by the Court of Appeals to be retributive.

So, I am simply going to reinstate your original sentence, 480 to 840 months, or 40 to 70 years, and trust the magnitude of the departure has now been fully explained and that justice has been done, not simply to you but to Carly Lewis and her family as well.

Defendant now challenges this sentence, raising four issues. We find only one meritorious.

## II. DISQUALIFICATION

Defendant asserts that Judge Rodgers should have disqualified himself because he had prior knowledge of the case and of Judge Power's sentencing views. Even had Judge Rodgers resentenced defendant impartially, defendant insists, disqualification was warranted due to the appearance that Judge Power influenced the new sentence. This issue has been rendered moot by our decision to order resentencing by a different judge. We address it briefly nonetheless.

MCR 2.003(C)(1)(b) provides that disqualification of a judge is warranted where

[t]he judge, based on objective and reasonable perceptions, has either (i) a serious risk of actual bias impacting the due process rights of a party as enunciated in *Caperton v Massey*, [556] US [868]; 129 S Ct 2252; 173 L Ed 2d 1208 (2009), or (ii) has failed to adhere to the appearance of impropriety standard set forth in Canon 2 of the Michigan Code of Judicial Conduct.[4]

In *Caperton*, 556 US at 881, the United States Supreme Court explained that where a defendant alleges judicial bias, "[t]he inquiry is an objective one. The Court asks not whether the judge is actually, subjectively biased, but whether the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.' " *Id.*

---

[4] Canon 2(A) of the Michigan Code of Judicial Conduct provides in pertinent part that "[a] judge must avoid all impropriety and appearance of impropriety."

At the hearing on defendant's disqualification motion, Judge Rodgers stated that although he and Judge Power "had some conversation regarding this case, as we often do," their talks were limited to mundane matters such as, "How's it going? Are you on schedule? How is the jury selection going?" Judge Rodgers denied any memory of "a particular conversation in this case," adding, "one thing I do remember is we never discussed how he should sentence in this case or what the appropriate sentence would be or how the guidelines should be scored. That is not a conversation that we had." To familiarize himself with the case facts, Judge Rodgers indicated that he planned to read the trial transcript before resentencing defendant.

After Judge Rodgers denied defendant's disqualification motion, defendant moved for reconsideration. The State Court Administrative Office assigned Otsego Circuit Judge George J. Mertz to review the motion pursuant to MCR 2.003(D)(3)(a)(*ii*). Judge Mertz also denied the motion, reasoning in relevant part:

> This Court supposes that it is possible that Judge Rodgers' participation in this case could create a perception in the minds of some that his decisions would be influenced by his working relationship with Judge Power, the publicity this case has garnered, or Judge Power's previous rulings. However, whether *any* person could perceive an impropriety is not the standard this Court must apply. Looking at this matter from an objective viewpoint this Court is convinced that a reasonable observer, informed of all the facts and circumstances set forth above, would not "apprehend" any impropriety.

We agree that Judge Rodgers' disqualification was not warranted under MCR 2.003(C)(1)(b). No evidence supports that Judge Rodgers was actually biased or prejudiced against defendant when he undertook the task of imposing a new sentence. Based on our review of the record, we conclude that a reasonable person could neither infer a serious risk of actual bias nor presume that Judge Rodgers' professional relationship with Judge Powers necessarily gave rise to an appearance of impropriety. Accordingly, Judge Mertz did not abuse his discretion in denying reconsideration of defendant's motion for disqualification.

## III. SENTENCING AND THE SIXTH AMENDMENT

Defendant next alleges that Michigan's sentencing scheme, which permits judges to enhance a sentence based on facts not proven beyond a reasonable doubt, violates the Sixth Amendment. See *Alleyne v United States,* 570 US __; 133 S Ct 2151; 186 L Ed 2d 314 (2013).

Our Supreme Court is currently considering this question. See *People v Lockridge*, 496 Mich 852; 846 NW2d 925 (2014). Until the Supreme Court issues its decision, we are bound by this Court's opinion in *People v Herron*, 303 Mich App 392; 845 NW2d 533 (2013), and must deny relief on this ground.

## IV. OFFENSE VARIABLE SCORES

Defendant maintains that Judge Rodgers incorrectly scored offense variables 1, 2, 6, 10, 13, and 19. In his first appeal, defendant challenged the scoring of these same variables. Our colleagues upheld Judge Power's scores, specifically finding defendant's challenges "without

merit." *Schwander I*, unpub op at 3. Judge Rodgers adopted Judges Powers' scores for these variables. The law of the case doctrine forecloses defendant's renewed scoring criticisms.

"The law of the case doctrine holds that a ruling by an appellate court on a particular issue binds the appellate court and all lower tribunals with respect to that issue." *New Props, Inc v George D. Newpower, Jr, Inc*, 282 Mich App 120, 132; 762 NW2d 178 (2009) (quotation marks and citation omitted). "[I]f an appellate court has passed on a legal question and remanded the case for further proceedings, the legal questions thus determined by the appellate court will not be differently determined on a subsequent appeal in the same case where the facts remain materially the same." *Id.* (quotation marks and citation omitted; alteration in original). This Court's previous analysis of Judge Power's scoring decisions falls squarely within law-of-the-case confines. To the extent defendant argues that by ordering resentencing this Court erased the previous scores in contemplation that Judge Rodgers would score them anew, we are unpersuaded. This Court is not in the habit of rendering advisory opinions. Accordingly, we decline to revisit the variables' scoring.

## V. THE DEPARTURE SENTENCE

We turn to the issue at the heart of this appeal: whether Judge Rodgers articulated substantial and compelling reasons for a sentence departure, and adequately justified the extent of the departure sentence imposed.

A defendant convicted of second-degree murder faces a sentence of imprisonment for life, or any term of years. MCL 750.37. When Judge Rodgers elected to impose a term-of-years sentence he became bound to apply the statutory sentencing guidelines in fixing the maximum and minimum terms of imprisonment. MCL 769.9(2). The Legislature has decreed that a court may depart from the sentencing range established by the guidelines only after articulating "substantial and compelling reasons" for so doing. MCL 769.34(3).

The sentencing guidelines contemplate that a judge will exercise considerable discretion in scoring the variables, deciding whether to depart from the calculated minimum sentence range, and in settling on a proportionate departure. That discretion, however, is not limitless. It does not encompass enhancing a defendant's sentence based on nonobjective and unverifiable criteria. Nor may a court deviate from the guideline's sentence based on characteristics fully accounted for in the offense and prior record variables.

Here, the jury rejected a first-degree murder verdict, thereby establishing that the existence of the requisite intent for first-degree murder—premeditation or deliberation—cannot be "verified." Further, because the sentencing guidelines took defendant's intent into account, defendant's conjectural mental state established neither a ground for departure nor a justification for the substantial departure sentence imposed.

In *People v Babcock*, 469 Mich 247, 257; 666 NW2d 231 (2003), our Supreme Court emphasized that "substantial and compelling reasons" for departure from the guidelines must be "objective and verifiable," and should "keenly" or "irresistibly" grab a court's attention. (Quotation marks and citation omitted.) A substantial and compelling reason "is external to the minds of the trial court, the defendant, and others involved in making the decision, and is capable

of being confirmed." *People v Kahley*, 277 Mich App 182, 186; 744 NW2d 194 (2007). To qualify as substantial and compelling, the reason also must be "of considerable worth" in deciding the length of a sentence. *Babcock*, 469 Mich at 257 (quotation marks and citation omitted). Substantial and compelling reasons for departing from the statutory guidelines exist only in "exceptional cases." *Id*. (quotation marks and citation omitted). "[W]hether the factor is objective and verifiable is a question of law that this Court reviews de novo." *People v Young*, 276 Mich App 446, 448; 740 NW2d 347 (2007).

In addition to articulating appropriate substantial and compelling reasons supporting a departure, a sentencing court must justify the extent of the departure; "the statutory guidelines require more than an articulation of reasons for *a* departure; they require justification for the *particular* departure made." *People v Smith*, 482 Mich. 292, 303; 754 NW2d 284 (2008) (emphasis in original). In *Smith*, the Supreme Court cautioned that

> if it is unclear why the trial court made a particular departure, an appellate court cannot substitute its own judgment about why the departure was justified. A sentence cannot be upheld when the connection between the reasons given for departure and the extent of the departure is unclear. When departing, the trial court must explain why the sentence imposed is more proportionate than a sentence within the guidelines recommendation would have been. [*Id.* at 304.]

## A. GROUNDS FOR A DEPARTURE SENTENCE

Judge Rodgers articulated a number of reasons supporting a departure. This Court previously approved two of them—that Carly's life could have been saved with prompt medical attention and that defendant betrayed the trust of the Lewis family. *Schwander I*, unpub op at 4. On resentencing, Judge Rodgers augmented the grounds for departure with: (1) defendant's "gross abuse" of the Lewis family's trust; (2) his lack of remorse; (3) the 12-day search for Carly that ensued when she was reported missing, which "generated reasonable community fear for the safety of other children;" and (4) defendant's "complete and utter disrespect" for Carly's body. We address two of these reasons.

Our Supreme Court has repeatedly rejected reliance on a defendant's expression of remorse as a ground for departure. *People v Daniel*, 462 Mich 1, 6-7; 609 NW2d 557 (2000); *People v Fields*, 448 Mich 58, 69; 528 NW2d 176 (1995). Expressions of remorse may be objective, the Supreme Court has observed, but "a defendant's intent when he expresses remorse is within his own mind and is, therefore, subjective." *Daniel*, 462 Mich at 8 n 9, quoting approvingly from *People v Krause*, 185 Mich App 353, 358; 460 NW2d 900 (1990). Somewhat incongruously, a defendant's lack of remorse may be considered by a sentencing court, as it bears relevance to an individual's potential for rehabilitation, *People v Wesley*, 428 Mich 708, 711; 411 NW2d 159 (1987), and the potential for rehabilitation is a relevant criterion "in fashioning an appropriate sentence." *Daniel*, 462 Mich at 7 n 8.

During his testimony, defendant admitted having referred to Carly as "an ungrateful, snotty drama queen" in a letter written while he was incarcerated and awaiting trial. This evidence sufficed to support Judge Rodgers' invocation of defendant's lack of remorse as a ground for departure.

On the other hand, the 12-day search for Carly and the concomitant community fear do not qualify as appropriate departure grounds. Michigan's sentencing scheme, including the guidelines, rest on the notion that punishment should fit the offense and the offender:

> [A] judge helps to fulfill the overall legislative scheme of criminal punishment by taking care to assure that the sentences imposed across the discretionary range are proportionate to the seriousness of the matters that come before the court for sentencing. In making this assessment, the judge, of course, must take into account the nature of the offense and the background of the offender. [*Milbourn*, 435 Mich at 651.]

Community reaction to a crime is not an *objective* benchmark of the nature of the offense or the character of the offender. Our system of justice is designed to shield the process from passing sentence from the anger, fear, or prejudices of the community. By requiring judges to apply the sentencing guidelines, we encourage a punishment decision driven by rules rather than passions. Fidelity to the law requires that a judge blind himself to public clamor. The community's condemnation is subsumed in its verdict, the legislative sentencing guidelines, and the maximum sentences prescribed by statute. Enhancing punishment based on a community's outrage is an invitation to sentencing inequity.[5]

Nevertheless, like the panel that reviewed this case the first time, we conclude that several aspects of the crime identified by Judge Rodgers and Judge Power justified an upward departure. Irrespective whether these appropriate criteria sufficed to impose *a* departure sentence, Judge Rodgers failed to justify the particular sentence he imposed.

## B. GROUNDS JUSTIFYING THE EXTENT OF THE DEPARTURE

Under the guidelines, the highest minimum sentence available to the sentencing court was a term of 22.5 years. Judge Rodgers imposed a minimum sentence of 40 years, exceeding the guidelines by almost 180%. The sentence he imposed is equal to the *highest* sentence prescribed by our Legislature for minors convicted of first-degree murder who do not receive a sentence of imprisonment for life without parole eligibility. MCL 769.25(9).

The reasonableness of defendant's sentence hinges on the validity of Judge Rodgers' explanation for imposing an extra 17.5 years' imprisonment, as opposed to an additional 5, 8, or 10 years. The United States Supreme Court has observed that the greater the departure from the sentencing range, the more compelling must be the justification for the departure. See *Gall v United States*, 552 US 38, 50; 128 S Ct 586; 169 L Ed 2d 445 (2007) ("We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one.").

---

[5] Judge Rodgers also listed the Department of Corrections' recommendation of an upward departure as a reason for his decision. The use of a Department of Corrections' agent's subjective opinion and recommendation was improper. *People v Perry*, 216 Mich App 277, 282-283; 549 NW2d 42 (1996).

Judge Rodgers identified several facts justifying the extraordinary extent of the sentence departure: (1) defendant's uncharged crimes of criminal sexual conduct in the third degree (CSC-3) and threatening a correctional officer and his family;[6] (2) "escalating negative behavior [at] school;" (3) the depravity of having allowed Carly to die without summoning aid; and (4) that defendant had committed a first-degree murder. Two of these reasons—defendant's uncharged CSC-3 and that in Judge Rodgers' view, defendant committed first-degree murder—do not support a departure sentence. The remaining reasons do not justify the extent of the departure sentence imposed.

Defendant's uncharged act of CSC-3 constitutes an offender characteristic accounted for in the guidelines. Defendant engaged in sexual activity with his girlfriend, who at the time was 15 years old. This misconduct supplied the factual basis for Judge Power's assessment of 25 points under OV 13. The 25-point score was the highest possible under OV 13.

Moreover, had defendant actually been charged with and convicted of CSC-3, the highest minimum imprisonment term available under the guidelines for that offense likely would not have exceeded 40 months. And while defendant's "Romeo and Juliet" sexual relationship with his 15-year-old girlfriend was illegal, similar offenders almost always receive a probationary sentence.

The sentencing court may not base a departure "on an offense characteristic or offender characteristic already taken into account in determining the appropriate sentence range unless the court finds from the facts contained in the court record, including the presentence investigation report, that the characteristic has been given inadequate or disproportionate weight." MCL 769.34(3)(b). Not only was defendant's CSC-3 incorporated within the calculation of OV 13, it is simply not "compelling" or of "considerable worth" in evaluating the need for a lengthy departure sentence. And Judge Rodgers neglected to elucidate why the 25 points scored for OV 13 were inadequate to punish this uncharged misconduct.

Next, we turn to Judge Rodgers' reasoning that defendant had actually committed first-degree murder. Whether *federal* judges may rely on acquitted conduct to enhance sentences is a hot-button issue in that arena. The dissenting opinion of Justice Scalia in *Jones v United States*, 574 US __; 135 S Ct 8; 190 L Ed 2d 279 (2014), succinctly summarizes the debate.[7] The federal

---

[6] The PSIR includes a letter written by a Grand Traverse County sheriff's deputy, recounting that after the deputy informed defendant that he could not have a shower, defendant became angry and asked "How's your wife." The letter continues: "This comment was overheard by Deputy Rhoades and I came back to the cell to confirm what he had said. [Defendant] had a smile and then stated 'You can't do anything.' It's obvious he meant this as a threat."

[7] Justice Scalia, joined by Justices Thomas and Ginsburg, argued in *Jones* that "any fact necessary to prevent a sentence from being substantively unreasonable—thereby exposing the defendant to the longer sentence—is an element that must be either admitted by the defendant or found by the jury. It *may not* be found by a judge." *Id*. at 8 (emphasis in original). See also Doerr, *Not Guilty? Go To Jail. The Unconstitutionality of Acquitted-Conduct Sentencing*, 41 Colum Hum Rts L Rev 235 (2009), *United States v Faust*, 456 F3d 1342, 1349 (CA 11, 2006)

sentencing guidelines are advisory, permitting judges the freedom "to exercise broad discretion in imposing a sentence within a statutory range." *United States v Booker*, 543 US 220, 233; 125 S Ct 738; 160 L Ed 2d 621 (2005). Michigan's guidelines are mandatory. The *en banc* Sixth Circuit has observed, "Had the district court in this case relied on acquitted conduct *in determining the range under a mandatory guidelines regime*, that sentence would have violated the Sixth Amendment as interpreted in *Booker*." *United States v White*, 551 F3d 381, 384 (CA 6, 2008) (emphasis in original).

We reserve for another day the question of whether a Michigan judge may nullify a jury's verdict to enhance a defendant's sentence. Regardless of the answer to that question, Judge Rodgers erred by finding that in this case, defendant's commission of a first-degree murder supplied a lawful basis for a substantial departure sentence.

That defendant premeditated or deliberated Carly's death is not objectively verifiable, and therefore cannot justify a departure. We acknowledge that in *People v Claypool*, 470 Mich 715, 729; 684 NW2d 278 (2004), a plurality of the Supreme Court suggested by way of *obiter dictum* that under certain circumstances, objective and verifiable evidence of a defendant's intent may be available in the record. This is not such a circumstance, as amply demonstrated by the jury's verdict acquitting defendant of first-degree murder.[8] Whether defendant premeditated or deliberated Carly's death is subject to various interpretations of the evidence. It is not capable of being confirmed, and cannot serve as a ground for enhancing defendant's sentence.

Moreover, the guidelines account for defendant's intent, rendering this subject inappropriate for departure. OV 6 addresses the "offender's intent to kill or injure another individual." A sentencing court scores 50 points if "the offender had premeditated intent to kill[,]" and 25 points if the offender "had unpremeditated intent to kill[.]" MCL 777.36(1), (1)(b). Judge Power scored 25 rather than 50 points. Because the facts relevant to defendant's intent were securely anchored within the scoring of OV 6, Judge Rodgers erred by basing a departure on a contradictory finding. Judge Rodgers' view that defendant committed first-degree murder neither supplies a proper ground for departure nor justifies the extent of the departure sentence imposed.

The remaining grounds for departure identified by Judge Rodgers do not justify the substantial discrepancy between the guidelines sentence and the sentence imposed. While threatening a corrections officer could qualify as a ground for departure, the "threat" involved here was a puerile and nonsensical question ("How's your wife[?]") asked of a guard by a 17-year-old who was angry that he could not have a shower. We certainly do not condone such insolence, but are hard-pressed to find that this single remark justifies an additional 17.5 years'

---

(BARKETT, J., specially concurring); *United States v Fitch*, 659 F3d 788, 799 (CA 9, 2011) (GOODWIN, J., dissenting); *United States v Canania*, 532 F3d 764, 776-778 (CA 8, 2008) (BRIGHT, J., concurring); *United States v White*, 551 F3d 381, 386 (CA 6, 2008) (MERRITT, J., dissenting).

[8] In dissent in *Claypool*, Chief Justice Corrigan emphasized, "The state of a defendant's mind is an inherently subjective factor and cannot suffice as an objective and verifiable factor for a sentencing departure." *Id.* at 738.

imprisonment. Nor did Judge Rodgers explain why defendant's "escalating negative behavior at school" was so compelling or exceptional that it warranted a major enhancement of defendant's guideline sentence.

Nor can we agree that defendant's "depraved" conduct in this case constituted an extraordinary circumstance justifying a 180% departure. We agree with Judge Rodgers that defendant's failure to summon aid for Carly as she lay dying is a horrible fact and consistent with "a depraved heart." But a killer's failure to summon aid for a dying victim is hardly unusual or extraordinary. The New York Court of Appeal observed,

> [A] killing . . . is not transformed into depraved indifference murder simply because the killer does not summon aid for the victim. Otherwise, homicides would be routinely and improperly converted into depraved indifference murders whenever—as is often the case—the killer leaves the scene. [*People v Suarez*, 6 NY3d 202, 210; 811 NYS2d 267; 844 NE2d 721, 727 (2005).][9]

That defendant did nothing to save Carly's life after strangling or stabbing her evidenced his intent to kill her. His indifference to her fate explains, in part, his conviction for second-degree murder rather than involuntary manslaughter.

Second-degree murder is "the unlawful killing of one human being by another with malice. . . ." *People v Goecke*, 457 Mich 442, 463-464; 579 NW2d 868 (1998). To establish second-degree murder, the prosecution must prove beyond a reasonable doubt that the defendant possessed an intent to kill or an intent to do great bodily harm, or created a very high likelihood that his actions would result in death or great bodily harm. *People v Dykhouse*, 418 Mich 488, 495; 345 NW2d 150 (1984). As our Supreme Court explained in *Goecke*, 457 Mich at 467 (citation omitted), the third of these "intent" descriptions corresponds to a killing committed with "an abandoned and malignant heart." In this variant of second-degree murder, malice is "implied "when the defendant does an act with a high probability that it will result in death and does it with a base antisocial motive and with wanton disregard for human life." *Id.* (quotation marks and citation omitted). In other words, in this category of second-degree murder, "malice requires egregious circumstances." *Id.*

Given that second-degree murder corresponds to a murder committed with an extreme indifference to the value of human life, it is fair to say that all such crimes qualify as "depraved." Virtually all involve killers who made no effort to provide aid to their victims. Judge Rodgers failed to explain how *this* second-degree murderer so exceeds other second-degree murderers in moral culpability that he should be punished for almost twice as long.

---

9 In *Suarez*, the Court of Appeals was construing a New York statute that classifies certain second-degree murders as "depraved indifference murder in the second degree." *Id.* at 206. In New York, depraved indifference murder involves reckless rather than intentional acts.

Departure sentencing offers an "escape valve" from the constraints of the mandatory sentence guidelines. That valve may be opened only in unique and extraordinary circumstances, but only to the extent that the departure sentence is proportionate to the offense and the offender. Here, some grounds exist for turning on the escape valve. Others do not. The appropriate grounds for departure cited by Judge Rodgers do not account for the magnitude of the departure sentence he imposed. Accordingly, we again vacate defendant's sentence and remand for resentencing.

We further direct that defendant be resentenced by a different judge appointed by the State Court Administrative Office. Judge Rodgers' comments at defendant's resentencing reflect that his opinions regarding an appropriate sentence are strongly held. While Judge Rodgers may be capable of banishing from his mind the personal views he has so forcefully expressed, to avoid the appearance of impropriety on remand and to shield the judicial process from any possible suspicion of bias, a new judge must resentence defendant.

We vacate defendant's sentence and remand for resentencing in conformity with this opinion. We do not retain jurisdiction.


/s/ Elizabeth L. Gleicher
/s/ Deborah A. Servitto